2004 SD 35

**STATE of South Dakota, Plaintiff and Appellee,**

v.

**William R. MOSCHELL, Gene T. Smith and Denis K. Moschell, Defendants and Appellants.**

Nos. 22464–22466.

Supreme Court of South Dakota.

Argued Oct. 7, 2003.

Decided March 10, 2004.

Lawrence E. Long, Attorney General, Craig M. Eichstadt, Robert E. Mayer, Deputy Attorneys General, Pierre, SD, for plaintiff and appellee.

David M. Hosmer, Yankton, SD, for defendants and appellants.

KONENKAMP, Justice.

[¶ 1.] Between October 1999 and December 2000, the South Dakota Game, Fish and Parks (GF & P) conducted an undercover investigation into the practices of a hunting guide service. In the investigation, undercover agents went on several hunts and hunted for a variety of game. The agents recorded numerous violations of South Dakota law. Defendants were charged and convicted of these violations. They appeal their convictions, contending that the legislative criminalization of GF & P regulations constitutes an unlawful delegation of authority, that several statutes and regulations are unconstitutionally vague, that their convictions rest on insufficient evidence, that the trial court improperly instructed the jury, and that their conditions of probation were unreasonable. We affirm on all issues.

## Background

[¶ 2.] William Moschell operated a hunting guide service. Agents of the GF & P suspected that William and his associates operated the service in disregard of state hunting laws. Unable to verify these suspicions, the GF & P brought in two Iowa Department of Natural Resources conservation agents to work undercover. Throughout the investigation, the agents participated in hunts with defendants William Moschell, Denis Moschell, and Gene Smith.

[¶ 3.] On November 16, 1999, the agents made initial contact with William. He told them to return on the last weekend of the pheasant season and participate in a large group hunt. The agents agreed and made plans to return. On December 17, 1999, the agents met up with William at a game production area. The agents participated in at least two pheasant hunts on that day. During the hunt, the agents observed radio coordination by the group members.

[¶ 4.] The following morning, December 18, 1999, the agents participated in a coyote hunt. Around noon, the members of the coyote hunting group returned to William's farm to organize an afternoon pheasant hunt. The large group of people split into two groups. One group consisted mainly of paying customers, while the other group consisted of William's friends. During the pheasant hunt the agents made the following observations:

1. William received messages over a radio informing him of the location of certain game;
2. William aimed his shotgun at pheasants from a vehicle;
3. Thirty-one members were hunting in a single group; and
4. William had possession of a hen pheasant.

Upon returning to William's farm, the agents made arrangements to come back on the opening pheasant hunting weekend the following year.

[¶ 5.] As arranged, the agents returned on October 21, 2000, the opening day of pheasant season. Once again, the participants were organized into two hunting parties. Members of the agents' group included William and Denis Moschell. The agents counted 26 members in their hunting group. Most of the agents' group was dropped off along the western edge of a field. As the hunters moved east, the agents noticed a large group of hunters moving toward them. The group of hunters moving toward the agents was the second group from William's farm.

[¶ 6.] The agents testified that they believed the members of that group were acting as blockers for their own group. However, a fence separated the two groups. William told the agents' group not to cross the fence because it was illegal to hunt in groups larger than 20 members. When the two groups met on opposite sides of the fence, 47 hunters were present.

[¶ 7.] On October 22, 2000, the agents returned to the Moschell farm. Following several hunts, the agents noted that William had in his possession a hen pheasant. At the conclusion of the day, the agents made arrangements to return later in the year to participate in a deer hunt.

[¶ 8.] The agents returned to William's farm on November 24, 2000. On that day, the hunting group included William, Denis, Gene Smith, and several other hunters. During the hunt, the agents observed:

1. A dog catch and return a hen pheasant to Denis who placed it under the seat of William's vehicle;

2. William receive a message over a radio alerting him to look out his window;

3. William chamber a round and twice point his shotgun out the window of his moving vehicle in an apparent attempt to shoot a hawk; and

4. William drive his vehicle into a field toward a pheasant that had been observed.

[¶ 9.] The next morning, November 25, 2000, the agents returned to hunt deer. William instructed that each vehicle should carry at least one deer license. William also told the group to use the radios for coordination, but to use the appropriate code words, since using radios was illegal. The agents rode in the vehicle with Denis. Denis had only one deer tag, which was a landowner's tag. During the hunt the agents observed:

1. Denis chamber a round into his rifle and take aim at a cottontail rabbit;

2. Denis obtain a radio for the purpose of communicating with the other groups; and

3. Denis shoot and kill a buck, not on his own land. The agents did not observe Denis tag the buck.

[¶ 10.] On November 26, 2000, the agents returned for their final day of hunting. During this hunt the agents observed:

1. William use a radio to communicate with others in the hunting party regarding the location of game;

2. William use his vehicle to intercept and block an escaping buck;

3. Gene Smith shoot and kill a buck despite not having a deer license;

4. William order others to load an untagged deer into a vehicle so that the feet were toward the vehicle passengers, thus allowing it to be quick-

ly tagged in case they were stopped by an enforcement agent; and

5. Denis unload another untagged deer, which Denis said had been shot behind his home.

The agents never observed a tag being placed on Smith's deer. According to the agents, they later saw Smith's deer lying in William's shop without a tag.

[¶ 11.] A jury convicted William, Denis, and Gene on several hunting violations. Each defendant was fined, ordered to pay restitution, assessed court costs, and sentenced to serve a term in jail. In addition, their hunting and trapping licenses were revoked for a period of time. As part of probation, the trial court suspended the jail sentences and imposed several conditions on defendants. Among those conditions, each was ordered to report to jail by 1:00 p.m. the day before the opening day of pheasant hunting season. Defendants would then spend the following twenty days in jail. This condition lasted for as long as defendants remained on probation.

[¶ 12.] Defendants now appeal on the following issues: (1) Whether GF & P regulations are an improper delegation of core legislative lawmaking powers. (2) Whether the defendants faced a "choice of evils" because of a statutory scheme that is impermissibly vague. (3) Whether statutory law forbidding one to "receive" an electronic form of communication is vague and overbroad. (4) Whether a cottontail rabbit is a "rodent." (5) Whether accidental or fence-separated hunting negates cooperation. (6) Whether there was sufficient evidence to show that a motor vehicle was used to disturb game animals. (7) Whether there was sufficient evidence to show Denis Moschell twice failed to tag big game, and hunted big game without a license. (8) Whether there was sufficient evidence to show that Gene Smith hunted big game without a license and shot big

game from a road right-of-way. (9) Whether the trial court's instruction relating to the legitimacy of the undercover investigation was given in error, and if so, whether it created reversible error. (10) Whether the trial court imposed reasonable and legal conditions on the suspension of a term of imprisonment.

## Analysis and Decision

### I.

[¶ 13.] Defendants first call on this Court to review whether the regulations promulgated by the GF & P originate from a proper delegation of authority by the Legislature. Where a party challenges the constitutionality of a statute, our review is de novo. *Boever v. South Dakota Bd. of Accountancy*, 1997 SD 34, ¶ 7, 561 N.W.2d 309, 311 (citing *Green v. Siegel, Barnett & Schutz*, 1996 SD 146, ¶ 7, 557 N.W.2d 396, 398). SDCL 41-2-18 provides in part:

> The Game, Fish and Parks Commission may adopt such rules as may be necessary to implement the provisions of chapters 41-1 to 41-15, inclusive. The rules may be adopted to regulate:
>
> * * *
>
> (2) The hunting, taking, killing, possession, sale and transportation of all wild birds, wild animals and wild fish....
>
> * * *
>
> (14) The devices, weapons, ammunition, traps, tackle, bait, lures and equipment which may be used to hunt, kill, capture or locate any wild animal or fish if use of the above items would adversely affect the health, safety or welfare of people or wildlife resources;
>
> * * *
>
> (19) The number of persons who may cooperate as a group in the pursuit, hunting, taking or killing of game birds or game animals;
>
> * * *

The rules shall be adopted pursuant to chapter 1-26 and shall be in accordance with the provisions of this chapter.

A violation of the substantive provision of any rule authorized by this section is a Class 2 misdemeanor. If the same incident is a violation of statute and of the rules authorized by this section only the penalty authorized for the violation of the statute may be imposed.

[¶ 14.] Defendants contend that this statute is an improper delegation of legislative power. The principle restraining the delegation of certain legislative powers derives from the separation of powers doctrine, explicitly stated in Article II of the South Dakota Constitution. That Article provides that "[t]he powers of the government of the state are divided into three distinct departments, the legislative, executive and judicial; and the powers and duties of each are prescribed by this Constitution." This provision encompasses three prohibitions: (1) no branch may encroach on the powers of another, (2) no branch may delegate to another branch its essential constitutionally assigned functions, and (3) quasi-legislative powers may only be delegated to another branch with sufficient standards. *Boe v. Foss*, 76 S.D. 295, 77 N.W.2d 1 (1956).

[¶ 15.] Under this doctrine, the Legislature cannot abdicate its essential power to enact basic policies into law or delegate such power to any other department. However, once the Legislature has created broad policy through its enactments, it may delegate in the execution of that policy certain quasi-legislative powers or functions to executive or administrative officers or agencies, provided it adopts standards to guide those officers or agencies in the exercise of such powers. *Id.* at 11. The question here is whether the Legislature gave sufficient guidelines or standards to the GF & P.

[¶ 16.] The test is to examine the challenged legislation to learn whether it delegates the power to create basic policy or fails to supply intelligible standards as guides in the exercise of the power delegated. *Id.* at 12–13. In *Hogen v. South Dakota State Bd. of Transp.*, 245 N.W.2d 493 (S.D.1976), the Court considered standards that allowed a delegation of power if it was determined to be "necessary" or "reasonable." The Court concluded that "[a] statute or ordinance which in effect reposes an absolute, unregulated, and undefined discretion in an administrative agency bestows arbitrary powers and is an unlawful delegation of legislative powers." *Id.*, at 497 (quoting *Affiliated Distillers Brands Corp. v. Gillis*, 81 S.D. 44, 50, 130 N.W.2d 597, 600 (1964)).

[¶ 17.] In *Oahe Conservancy Subdistrict v. Janklow*, 308 N.W.2d 559 (S.D. 1981), the Court described the test as one of sufficiency. Did the delegation sufficiently prescribe a policy, standard, or rule for carrying out the legislative objective? *Id.* at 563. A delegation will not stand if it grants "unlimited or absolute discretion." *Id.* at 564 (citing *Wall v. Fenner*, 76 S.D. 252, 76 N.W.2d 722 (1956)); *see also Schryver v. Schirmer*, 84 S.D. 352, 171 N.W.2d 634 (1969).

[¶ 18.] From these cases, the doctrine is settled: the Legislature cannot delegate its essential lawmaking powers to any other department; however, it may delegate quasi-legislative powers to an administrative agency to carry out legislative objectives, provided that the delegation has sufficient guidelines. *See, e.g., First Nat'l Bank v. Kehn Ranch, Inc.*, 394 N.W.2d 709 (S.D.1986); *Kehn Ranch, Inc. v. Milbank Mutual Insurance Company*, 394 N.W.2d 709, 718 (S.D.1986).

[¶ 19.] Defendants argue that defining the specific elements of a crime is an essential function of the Legislature, and as such, is not delegable. However, it is the policy guidance, not necessarily the details or elements, that control whether a delegation of power is permissible. In *Boe*, the Court wrote that it is fundamental that "the Legislature cannot abdicate its essential power to enact *basic policies* into law[.]" 77 N.W.2d at 11. It is equally "fundamental and settled . . . that having written *broad policy* into law the Legislature, in the execution of that policy, can delegate quasi-legislative power or functions[.]" *Id.* (citations omitted) (emphasis added).

[¶ 20.] In *Affiliated Distillers Brands Corp.*, we explained the interplay between legislative policy and agency rule making:

> The theory of administrative rule making is that in certain fields and in some respects public interest is better served by delegating a large part of detailed law making to expert administrators, controlled by *policies*, objects and standards laid down by the [L]egislature, rather than having details spelled out through traditional legislative process.

130 N.W.2d at 599 (citations omitted) (emphasis added). In adopting the rationale presented in *Boe*, we stated, "[T]he delegation is not constitutionally offensive where the [L]egislature has adopted a clearly declared *policy* and has laid down understandable standards to guide the administrative action." *Id.* (citations omitted) (emphasis added).

[¶ 21.] Finally, in *South Dakota Migratory Bird Ass'n v. South Dakota Game, Fish and Parks Comm'n*, 312 N.W.2d 374, 376 (S.D.1981), this Court specifically held that the predecessor of the current version of SDCL 41–2–18 provided "the sufficient guide" to the GF & P to carry out the legislative policy set forth in that statute.

[¶ 22.] Defendants miscalculate in relying on our holding in *State v. Johnson*, 84

S.D. 556, 173 N.W.2d 894 (1970). In *Johnson*, we held unconstitutional a statute that "attempt[ed] to adopt any and all regulations and changes therein promulgated under the federal act in futuro ad infinitum." *Id.* at 558, 173 N.W.2d 894. Certainly, our holding did not rest on the fact that the Legislature delegated the determination of elements of a penal statute to an administrative agency.

[¶ 23.] We decline to break with our own precedent to follow, as defendants advocate, the decision in *State v. Broom*, 439 So.2d 357 (La.1983). There, the Louisiana Supreme Court determined, "Under the Louisiana Constitution of 1974, the Legislature cannot delegate the right to define felony offenses to administrative bodies or department heads." *Id.* at 369. Other than its declaration that the delegation of such power is unconstitutional, the *Broom* Court provides but a single sentence to support its rationale, " 'With all the obvious flaws of delay, untidiness, and potential for abuse, we have not yet found a better way to preserve freedom than by making the exercise of power subject to the carefully crafted restraints spelled out in the Constitution.' " *Id.* (citation omitted). At a minimum, the Court's reasoning is circular. The decision purports to adhere to the "carefully crafted restraints spelled out in the Constitution." However, the Court leaves unanswered the unavoidable question, what are those restraints spelled out by the doctrine of separation of powers? Without reason or rationale, the *Broom* Court merely supposes that defining criminal offenses is within the "carefully crafted restraints."

[¶ 24.] SDCL 41–2–18 provides sufficient guidance for the GF & P. The Legislature clearly expressed a will to protect our state's wildlife. Further, it guided the GF & P on the adoption of certain rules and regulations. Among the Legislature's stated policies in the statute is that the GF & P should regulate: the "hunting" of "wild birds" and "wild animals;" the weapons that should or should not be used by those desiring to hunt; and the "number of persons" in a hunting group. Finally, it was the Legislature, not the GF & P, that determined that violations of the regulations promulgated by the GF & P would be a Class 2 misdemeanor.

[¶ 25.] "There are many things upon which wise and useful legislation must depend which cannot be known to the law-making power, and must therefore be a subject of inquiry and determination outside of the halls of legislation." *Field v. Clark*, 143 U.S. 649, 694, 12 S.Ct. 495, 505, 36 L.Ed. 294, 310 (1892). Our Legislature cannot know in advance each year, for example, what the pheasant population will be each fall hunting season, or the deer population, or how recent weather conditions affect the condition of our wildlife. The GF & P has the expertise to ascertain this type of information and regulate hunting from season to season. That the Legislature refused to deem itself an expert in the field of wildlife conservation is of no legal import, and our constitution does not lay such a burden on it. We conclude that the delegation of power in SDCL 41–2–18 is proper.

## II.

[¶ 26.] With respect to the possession of a hen pheasant, defendants next argue that they "faced a 'choice of evils' because of a statutory scheme that is impermissibly vague," and because of that scheme, the trial court's refusal to allow an instruction that they faced a "choice of evils" was an abuse of discretion. In examining the issue, we look to the pertinent language of the statutes. SDCL 41–11–4 provides:

Except as provided in § 41-11-5, no person may hunt, take, kill, ship, convey, or cause to be shipped or transported by common or private carrier to any person, either within or without the state, buy, barter, expose for sale, sell to anyone, have in possession or under control at any time, any ... Chinese ringnecked or English pheasant ... or any part thereof. A violation of this section is a Class 2 misdemeanor.

The exception, SDCL 41-11-5, authorizes the GF & P to establish a hunting season on any of the fowl specified in SDCL 41-11-4. SDCL 41-1-4 provides, "No person may wantonly waste or destroy any of the birds, animals, or fish of the kinds protected by the laws of this state. A violation of this section is a Class 2 misdemeanor."

[¶ 27.] We need not delve into an abstract analysis of the language presented in SDCL 41-1-4; a brief look at the definition of the word "waste" is sufficient. The American Heritage Dictionary defines "waste" as "[t]o use, consume, spend, or expend thoughtlessly or carelessly." AMERICAN HERITAGE COLLEGE DICTIONARY 1523 (3d ed 1997). Standing alone, this definition suffices to expose the defendants' flawed logic. South Dakota law specifically prohibits the unauthorized possession of a hen pheasant. Therefore, one who would leave a hen pheasant in a field, in compliance with the law, cannot be said to have carelessly or thoughtlessly misspent that pheasant. Under such circumstances, a citizen would be obeying the laws of the State.

[¶ 28.] Defendants' argument that they were presented with a "cruel dilemma" when faced with the decision to either leave behind a dead hen pheasant or take possession of and transport the hen pheasant is meritless. The trial court did not abuse its discretion in denying defendants' proposed instruction.

## III.

[¶ 29.] Defendants William and Denis Moschell were convicted of using electronic equipment to hunt, in violation of ARSD 41:06:04:08. That regulation provides:

A person may not send or receive a message by radio, cellular telephone, or other electronic form of communication while in or on a motor vehicle for the purpose of hunting big game, small game, or migratory waterfowl.

Defendants do not challenge this regulation, but they argue that Jury Instruction 5, explaining the regulation, was unconstitutionally vague and overbroad, thus allowing the jury to determine what the law should be.

[¶ 30.] Instruction 5 states in part, "Any person who sends or receives a message by radio, cellular phone, or other electronic form of communication while in or on a motor vehicle for the purpose of hunting big game, small game or migratory waterfowl is guilty of a crime." Defendants argue that without a separate definition of the word "receives," the jury was left to speculate on its meaning and breadth. They argue that a person receiving such a message may be found guilty of a crime despite having no intent to receive and use the message for the purpose of hunting game. The instruction stated the elements necessary to prove the offense.

1. The defendant did send or receive a message by radio, cell phone or other electrical form of communication;

2. Such message or communication took place while the defendant was in or on a motor vehicle; and

3. Such message or communication was given for the purpose of hunting big game, small game or migratory waterfowl.

[¶ 31.] For one to be found guilty of the crime, one must either send or receive "a message via radio, cellular phone, or other electronic form of communication." However, only sending or receiving an electronic communication is not enough. One must also be either "in or on a motor vehicle." Sending or receiving an electronic communication while in a vehicle is not enough. The regulation sets forth a final requirement that one may not send or receive the message for the "purpose" of hunting game. The final requirement mandates that one must have the intent to use the message to hunt game.

[¶ 32.] Defendants argue that the elements, as broken out in the instruction, do not require intent on the part of the receiver. Admittedly, the third element could have been better framed. A more proper definition of the third element might read, "Such communication or message was given *or received* for the purpose of hunting big game, small game, or migratory waterfowl." However, we read jury instructions as a whole. *State v. Frazier*, 2001 SD 19, ¶ 35, 622 N.W.2d 246, 259 (citations omitted). In examining the instruction in its entirety, we note that the law as laid out in the instruction properly mandates that defendants intended to use the message for its prohibited purpose. Furthermore, Jury Instruction 16 provided, "In *all* of the crimes charged in the indictment the defendant must have criminal intent." We cannot say that the instruction was so flawed as to warrant a reversal.

[¶ 33.] Defendants next argue that this violation implicates the First Amendment. Criminalizing the receipt of electronic messages designed to illegally enhance hunting does not offend any rights guaranteed under our Constitution. "[I]t has never been deemed an abridgment of freedom of speech or press to make a course of conduct illegal merely because the conduct was in part initiated, evidenced, or carried out by means of language, either spoken, written or printed." *Cox v. Louisiana*, 379 U.S. 559, 563, 85 S.Ct. 476, 480, 13 L.Ed.2d 487, 491 (1965). Freedom of speech does not extend its protection to speech used as part of criminal conduct. *Giboney v. Empire Storage & Ice Co.*, 336 U.S. 490, 498, 69 S.Ct. 684, 688–89, 93 L.Ed. 834, 841 (1949). That South Dakota has a significant interest in protecting its wildlife is not contested here, only that the means are broader than necessary. In very specific terms, the rule narrowly defines the communication that is prohibited. Defendants are incorrect in their assertion that the rule prohibits an individual from merely receiving information without any intent. Consequently, the regulation did not deny defendants any of their constitutionally protected rights.

[¶ 34.] Here, there was ample evidence from which a jury could decide that defendants had the requisite intent. This is not a case of someone inadvertently receiving a message. The defendants had a method of hunting that included radio communications detailing the location of big and small game. On several occasions, messages were given to various hunters in the party. On receipt of those messages, the receiver would immediately react to the message. The hunters not only received messages, but from their conduct it could be inferred that they expected to receive those messages. A system of code words was devised by defendants indicating that they were aware that their conduct was prohibited. We cannot say the regulation was overly broad, or that the instructions inadequately set forth the law.

## IV.

[¶ 35.] Defendants next contend that a cottontail rabbit is a rodent,

and therefore, ARSD 41:06:04:07 did not prohibit the pointing of a firearm at a rabbit from inside a motor vehicle. They reason that the trial court erred because the instruction incorrectly states the law. The standard for determining whether a statute is unconstitutionally vague is whether it gives people of *ordinary intelligence* fair notice that certain conduct is prohibited. *U.S. v. Harriss,* 347 U.S. 612, 617, 74 S.Ct. 808, 812, 98 L.Ed. 989 (1954). One cannot be held criminally liable for conduct one could not reasonably understand to be forbidden. *Id.* A statute is unconstitutionally vague where people of ordinary intelligence may apply the statute differently. *State v. Dale,* 439 N.W.2d 98, 106 (S.D.1989) (citations omitted).

[¶ 36.] ARSD 41:06:04:07 provides:

A person may not allow a firearm to protrude from a motor vehicle or a conveyance attached to a motor vehicle on a public highway during a hunting season except while discharging the firearm at coyotes, jackrabbits, *rodents,* skunks, badgers, raccoons, and foxes.

(Emphasis added.) SDCL 41–1–1(24) provides:

"Small game," anatidae, commonly known as swans, geese, brants, merganser, and river and sea ducks; the rallidae, commonly known as rails, coots, and gallinue; the limicolae, referring specifically to shore birds, plover, snipe, and woodcock; the gruidae, commonly known as sandhill crane; the columbidae, commonly known as the mourning dove; the gallinae, commonly known as grouse, prairie chickens, pheasants, partridges, and quail but does not include wild turkeys; cottontail rabbit; and fox, grey and red squirrel. The term includes facsimiles of small game used for law enforcement purposes.

Jury Instruction 6 presented the regulation and its elements.[1] Jury Instruction 7 states in its entirety, "Pheasants and cottontail rabbits are defined as 'small game' by South Dakota law."

■ [¶ 37.] Initially, we look into the meaning of the term "rodent." A cottontail rabbit is not a rodent in scientific terms. Scientific names derive from the science of taxonomy, the hierarchy of biological classification comprised of kingdom, phylum, class, order, family, genus, and species. *See* McGraw-Hill Concise Encyclopedia of Science and Technology 1847–48 (2d ed. 1989). We take judicial notice of the scientific classification of cottontail rabbits because in the taxonomic sense this issue is undisputed. Under SDCL 19–10–2 (Rule 201(b)(2)), "[a] judicially noticed fact must be one not subject to reasonable dispute in that it is . . . capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Cottontail rabbits are mammals of the family Leporidae, order

---

1. Jury Instruction 6:

In Counts 14 and 22 William R. Moschell is charged with Protrusion of a Firearm from a Motor Vehicle.

In Count 42 Denis K. Moschell is charged with Protrusion of a Firearm from a Motor Vehicle.

Any person who allows a firearm to protrude from a motor vehicle on a public highway during hunting season except while discharging the firearm at coyotes, jackrabbits, rodents, skunks, badgers, raccoons and foxes is guilty of a crime.

The essential elements of the crime of Protrusion of a Firearm from a Motor Vehicle, each of which the State must prove beyond a reasonable doubt, are that at the time and place alleged:

1. The defendant allowed a firearm to protrude from a motor vehicle;
2. Such protrusion occurred on a public highway during a hunting season; and
3. The defendant was not discharging the firearm at a coyote, jackrabbit, rodent, skunk, badger, raccoon or fox.

Lagomorpha. *See* Wilson, Don E., and DeeAnn M. Reeder, eds., Mammal Species of the World: A Taxonomic and Geographic Reference (Smithsonian Institution Press, 2nd ed. 1992). Rodents are a distinct group of mammals in the Rodentia order. *Id.* Thus, scientifically, there is no merit to defendants' argument.

[¶ 38.] However, the defendants' reference to SDCL 34–20–24, and the Webster Collegiate Dictionary seek to question whether a rabbit cannot perhaps be considered a rodent in a more general sense. SDCL 34–20–24 provides, "Section 34–20–24 shall not apply to the laying out of poison for the control of ground squirrels, pocket gophers, mice, prairie dogs, rabbits, and other food, crop, and tree destroying rodents or magpies and insects...." At first glance, the statute does appear to classify a rabbit as a rodent. Yet, a closer look at the statute can also lead to the conclusion that the phrase "other ... rodents" simply refers to rodents not listed in the statute. Therefore, the statute adds little to our analysis.

[¶ 39.] Next, defendants point to two separate dictionaries defining the term rodent. One of the definitions listed in Webster's Collegiate Dictionary for "rodent" is "a small mammal (as a rabbit or a shrew) other than a true rodent." Therefore, it would seem, at least according to some lexigraphical but not taxonomical authorities, that in a general sense a rabbit may be considered a rodent, though not a "true" rodent. Perhaps it is more accurate to say that they are "rodentlike." *See* WEBSTER'S ENCYCLOPEDIC UNABRIDGED DICTIONARY (Gramercy Books 1994). Yet we do not believe that persons of ordinary intelligence would conclude that when a statute specifically describes a cottontail rabbit as "small game," hunters may consider them "rodents" for the purpose of shooting them from their automobiles.

When statutory provisions conflict and full weight cannot be given to each, the more specific statute should be deemed to reflect legislative intent. *Cf. State v. Greger,* 1997 SD 14, ¶ 21, 559 N.W.2d 854, 864.

**V.**

[¶ 40.] We review defendants' next four assignments for error under the following standard. This Court has repeatedly held that it will review the record to determine whether the State has presented sufficient evidence on which the jury could reasonably find a defendant guilty of the crime charged. *State v. Guthrie,* 2001 SD 61, ¶ 47, 627 N.W.2d 401, 420. We ask only if there is sufficient evidence in the record that, if believed, would be adequate to sustain a conviction beyond a reasonable doubt. *Id.* "[T]he Court will accept the evidence, and the most favorable inference fairly drawn therefrom, which will support the verdict." *State v. Gonzalez,* 2001 SD 47, ¶ 7, 624 N.W.2d 836, 838 (citation omitted). We will set aside a jury verdict only when the evidence and the reasonable inferences from it fail to sustain any rational theory of guilt. *State v. Hage,* 532 N.W.2d 406, 410 (S.D.1995). As a reviewing court, we will not resolve conflicts in the testimony, pass on the credibility of witnesses, or weigh the evidence. *Id.* "[I]t is the function of the jury in resolving factual conflicts, to weigh the credibility of those who testify, and ascertain the truth." *State v. Moran,* 2003 SD 14, 36, 657 N.W.2d 319, 328. All elements of the crime, including intent may be established circumstantially. *Guthrie,* 2001 SD 61, ¶ 48, 627 N.W.2d at 421; *State v. Davi,* 504 N.W.2d 844, 856–57 (S.D.1993).

**a.**

[¶ 41.] Defendants contend that two groups hunting on opposite sides of a

fence cannot be said to be cooperating. We believe the presence of a fence separating two groups may negate an inference of cooperation, but whether their coming together was incidental is an issue of fact properly left to a jury.

[¶ 42.] ARSD 41:06:04:02 provides: "No more than 20 persons may cooperate as a group in hunting, except when hunting jackrabbits or predators." According to the testimony of both undercover agents, it was normal practice for some of the hunters to act as "blockers." Blockers are hunters who remain stationary while other hunters flush game. The result was that the game being herded in a particular direction must be eventually exposed either to those flushing the game or to the blockers.

[¶ 43.] Defendants argue that they could not have been cooperating because the groups were separated by a fence and did not commence their hunt at the same location. This argument simply defies logic. The larger the group of cooperating hunters, the greater amount of territory the hunters can cover. It was the presence of the blockers at the opposite end of the field that presented a barrier for the game being flushed, not the presence of a wire fence within that field. Given a sufficient number of hunters, a cooperating group could encircle large amounts of game.

[¶ 44.] Whether this large group of hunters was cooperating was a question of fact for the jury to determine. While the presence of many hunters in a field was insufficient to establish that they were cooperating, evidence was presented to the jury that the groups did have a common goal or benefit. The State presented evidence during the trial that defendants gave specific instruction on how to carry out the hunt. It was only necessary to show that defendants participated in a cooperative hunt. There was ample evidence to show that the groups of hunters did not come together by coincidence.

[¶ 45.] The jury was free to determine from the evidence presented that the two groups of hunters were in reality acting as one. The presence of the fence in the field presented no more of a legal barrier to the jury than it presented a physical barrier to the game in the field. Likewise, the jury was free to determine that the starting points of the hunters were merely part of a large-scale plan to flush the maximum number of game from the grounds being hunted.

**b.**

[¶ 46.] ARSD 41:06:04:06 provides:

In addition to the provisions of § 41:06:04:01, a person may not use a motor vehicle to scare, harass, disperse, rally, drive, chase, intercept, pursue or disturb in any manner big game, small game, or migratory waterfowl.

For their sixth assignment for error, defendants contend that "Parking close to the game does not equate to 'disturbing' the game." We conclude that there was sufficient evidence presented from which the jury could infer that defendants intended to do more than park next to game, but, instead, intended to either scare, harass, disperse, rally, drive, chase, intercept, pursue, or disturb game.

[¶ 47.] First, defendants argue that the sole reason for driving a vehicle into a field was to move in closer for a shot at some pheasants. They argue that both agents stated during trial that the purpose of doing so was to draw closer for a shot at the birds. Second, defendants argue that when defendant William Moschell "drove his vehicle toward the location where a deer was seen," the sole purpose was to move in "to get a better shot." Again,

defendants contend that witnesses to the event testified that the sole intent was to get a better shot.

[¶ 48.] Defendants argue that the evidence presented during trial could not reasonably allow the jury to find the requisite intent to "scare, harass, disperse, rally, drive, chase, intercept, pursue or disturb" game. Not only did the State's witnesses testify about what they believed was the intent, but they also testified about what they actually saw. One agent testified, "We were chasing [the pheasants] out into the field." He also testified that while pursuing a large buck in a vehicle, Defendant William Moschell "cut [the buck] off," forcing the buck to turn in a different direction. The agent testified that weapons were aimed out of the windows of the vehicle during encounters. This is hardly a case where game was stationary in a field and a vehicle was used to gain a better vantage point. In both instances, the game was fleeing and a vehicle was used in an attempt to head off the game. Likewise, the other agent testified about the encounter with the pheasants, "[H]e took off chasing after [the pheasants]." As for the buck encounter, the agent testified that defendant William Moschell was "trying to cut the deer off, trying to beat the deer to the corner." Both agents confirmed that during the encounters weapons were pointed outside the window of the vehicle in an attempt to shoot the game.

[¶ 49.] Testifying for the defense, neither Gerald Van Sickle nor James Roby mentioned intent during the particular encounters cited. When asked whether he remembered defendants chasing down a buck with his vehicle, Van Sickle testified, "I don't remember." Witness Roby's testimony was put forth in a general nature referring to no specific event. When asked whether William Moschell would use his vehicle to pursue a deer, Roby testified, "I have seen that done, yes." But Roby denied that he and William Moschell would ever use a vehicle to "chase" a deer down. He testified that he would "[s]ee if we can [come] close enough, sometimes I would do it, I guess, seem to get a better look at it." With the conflicting testimony, the jury could have reasonably believed that William Moschell intended to do more than to park near game.

### c.

[¶ 50.] Defendants next contend that insufficient evidence was presented at trial to convict Denis Moschell of two counts of failing to tag big game and hunting without a license, and insufficient evidence was presented to convict Smith of hunting big game without a license and shooting from a right-of-way. *See* SDCL 41–8–6; 41–8–18.

[¶ 51.] One of the agents testified that Denis shot a buck on November 25, 2000 for which he did not have a license. The agent said that Denis did not tag the deer. The other agent also testified that Denis shot a deer on that date and did not tag it. Finally, the agent testified that on November 26, 2000, he helped Denis unload another deer out of Denis's vehicle. He testified that Denis stated he had shot the deer on his property, but there was no tag on the deer.

[¶ 52.] One agent testified that he saw Smith shooting at a buck on November 26, 2000. Both Agents testified that Smith claimed to have shot the buck. One agent indicated the location from where Smith had shot the buck. The jury chose to believe the agents. We find no error here.

### VI.

[¶ 53.] Defendants next argue that Jury Instruction 19 improperly bolstered the State's case and invaded the

province of the jury. The first two sentences of Instruction 14 provide:

> Undercover police investigations are an accepted and necessary part of law enforcement. The Court has determined that the undercover investigation conducted by the South Dakota Department of Game, Fish and Parks was properly and legally conducted.

Counterbalancing Instruction 14 were Instructions 25 and 29. Instruction 25:

> You are the sole and exclusive judges of all questions of fact and the credibility of the witnesses and the weight to be given the testimony of each of them.
>
> In determining the credit to be given any witness you may take into account the witness' ability and opportunity to observe, memory, manner while testifying, and interest, bias, or prejudice the witness may have, and the reasonableness of the testimony considered in light of all the evidence in the case.
>
> If you believe that any witness has knowingly sworn falsely to any material fact in the case, you may reject all of the testimony of such witness.

Instruction 29:

> Consider this case carefully and honestly with due regard for the interests of society and the rights of the defendant. You should decide the case fairly and impartially upon the evidence and the instructions of the court. It must not be decided from any feeling of bias against or prejudice for the defendant.
>
> Your duty upon such fair consideration of the case is to determine whether the defendant is guilty or not guilty of the offense charged.

[¶ 54.] We review jury instructions as a whole. *Frazier*, 2001 SD 19, ¶ 35, 622 N.W.2d at 259. If as a whole, the instructions mislead, conflict, or confuse then reversible error results. *Moran*,

2003 SD 14, ¶ 15, 657 N.W.2d at 324 (citations omitted). It is equally well-established that a party charging that an instruction was erroneous maintains not only the burden of showing that the instruction was error, but also the burden of showing that it was prejudicial. *Id.* Prejudice is established by showing that in all probability a jury would have returned a different verdict had the instruction not been given. *Id.* A bare assertion that an instruction created prejudice will not suffice. *Wheeldon v. Madison*, 374 N.W.2d 367, 372 (S.D. 1985).

[¶ 55.] The trial judge composed Instruction 14 in response to his concern that "improper and misleading evidence [was] set before the jury." The judge expressed two primary concerns. First, testimony during the trial might falsely lead the jury to believe that the GF & P improperly used state funds to finance the undercover operation. Second, questioning and testimony during the trial might lead the jury to conclude that because the agents were present while the illegal activity took place they had violated South Dakota law.

[¶ 56.] A similar instruction was given in *State v. Strong*, 90 S.D. 652, 245 N.W.2d 277 (1976). There, we found no reversible error when the trial court instructed, "In drug related offenses it is a recognized and permissible means of apprehension to have law enforcement personnel infiltrate the illegal activity and gain the confidence of the defendant. Hence, the use of undercover personnel does not, in itself constitute entrapment." *Id.* at 661, 245 N.W.2d 277. Admittedly, the case presented before us is not entirely analogous. In *Strong*, however, it could be said that the argument against such an instruction would be greater than here. When used to define entrapment, the instruction goes beyond the issue of whether the instruction comments on an undercover agent's

testimony. The instruction necessarily cuts to the heart of the issue, whether the undercover operation constituted entrapment. We do not suggest here that the trial court intended such a use for its instruction. We simply note that on occasion, it is permissible for a trial court to comment on the legitimacy of an undercover operation.

[¶ 57.] Here, the instruction foreclosed the jury from considering the legitimacy of the undercover operation and whether the agents themselves acted legally. Defendants argue that in certain respects the trial court vouched for some of the actions of the agents. The instruction tells the jury that the agents acted "properly and legally" and that their actions were "accepted and necessary" in participating in the investigation. Yet, the legitimacy of the investigation was never realistically brought into question. Defendants do not suggest how the agents acted illegally or that somehow the agents' actions led the defendants into criminal behavior they would otherwise have not committed.

[¶ 58.] Instructions 25 and 29 ameliorate Instruction 14. The erroneously given instruction did not take away the jury's discretion in determining the credit to be given any witness, "[T]he witness' ability and opportunity to observe, memory, manner while testifying, and interest, bias, or prejudice the witness may have, and the reasonableness of the testimony considered in light of all the evidence in the case." Instruction 25 puts that duty on the jury. Instruction 29 informed the jury it was its duty "to determine whether the defendant is guilty or not guilty of the offense charged." Whether the operation was legally and properly conducted was not an issue in the case. With these latter instructions, the jury was duly informed that it had the sole responsibility of judging the evidence presented.

[¶ 59.] Given that the erroneous instruction was confined to an issue not in controversy, and given that other instructions properly placed with the jury the determination of credibility of the witnesses we hold that the error and prejudice, if any, created by the instruction was harmless.

## VII.

■■■ [¶ 60.] As their final assignment of error, defendants argue that the trial court's sentences were unreasonable. In analyzing the issue of whether the conditions placed upon defendants were reasonable and legal, we first look to whether such an imposition is prohibited by law. SDCL 23A–27–18.1 provides:

> The conditions of probation imposed ... or the conditions of suspension of execution ... may include the requirement that the defendant be imprisoned in the county jail for a specific period not exceeding one hundred eighty days or in the state penitentiary for a specific period not exceeding one hundred eighty days or the sentence which was imposed or which may be imposed by law, whichever, is less. The imprisonment may be further restricted to certain days specified by the court as part of such conditions.

Clearly, the statute recognizes that imprisonment may be imposed on those with suspended sentences and those placed on probation. It is equally clear that courts need not order defendants to serve those days consecutively. The statute allows jailing for a certain number of days as a condition of suspension of sentence or a condition of probation. Thus, there is no statutory prohibition precluding the conditions prescribed by the circuit court in this case.

■■■ [¶ 61.] Next, we look to whether the conditions were reasonable. Defen-

dants were convicted of several hunting violations. Each defendant was sentenced as follows: William Moschell, 2 years 38 days imprisonment; Gene Smith, 2 years 60 days imprisonment; and Denis Moschell, 3 years 120 days imprisonment. The sentences were suspended on the condition that defendants follow certain conditions of probation. Here, it is perfectly logical and reasonable that as a condition of probation, the court imposed jail terms on defendants starting on the opening day of each hunting season. Given that their convictions evinced blatant disdain for the hunting laws, it would be during this specific time that defendants would more likely break the conditions of probation.

[¶ 62.] Defendants argue that the trial court already had several mechanisms in place to ensure their compliance with the law. But obviously, the judge believed that their disdain for the laws of this State showed that it would be unlikely that anything short of jail would discourage them from violating those laws again. Defendants argue that it was unreasonable to require William to pay fines and restitution and prevent him from guiding hunting expeditions. William operated a hunting service in almost complete disregard for the game regulations. We conclude that defendants have failed in their burden of showing that the trial court acted unreasonably in setting the conditions for probation.

[¶ 63.] Affirmed.

[¶ 64.] GILBERTSON, Chief Justice, and SABERS, ZINTER, and MEIERHENRY, Justices, concur.