2005 SD 123

**The PEOPLE of the State of South Dakota In The Interests of B.J.T., Minor Child, and Concerning K.H., Respondent Mother,**

**and**

**B.T., Respondent Father.**

No. 23640.

Supreme Court of South Dakota.

Considered on Briefs Nov. 7, 2005.

Decided Dec. 14, 2005.

Lawrence E. Long, Attorney General, Grant Gormley, Assistant Attorney General, Pierre, South Dakota, for appellee State of South Dakota.

Kelly Stricherz, Minnehaha County Public, Defender's Office, Sioux Falls, South Dakota, for appellant B.J.T.

PER CURIAM.

[¶ 1.]   B.J.T. appeals his adjudication as a juvenile delinquent. We affirm.

## FACTS

[¶ 2.] Seventeen-year-old B.J.T. lived with his mother and stepfather in Sioux Falls and maintained joint checking and savings accounts with his stepfather at the Sioux Falls Federal Credit Union (Credit Union). B.J.T. later moved out of his mother and stepfather's residence and in with his father in Dell Rapids. Around July 4, 2004, B.J.T. received two statements from the Credit Union. One of the statements indicated he had an unexpectedly large balance of over $7,500 in his account. On July 6, B.J.T. went to the South Cliff Branch of the Credit Union in Sioux Falls and withdrew $4,600 in cash. Later that day, he went to the Louise Avenue Branch of the Credit Union in Sioux Falls where he attempted to withdraw another $3,500 in cash. After some confusion in verifying B.J.T.'s account, he was allowed to withdraw the $3,500. On July 9, B.J.T. returned to the Louise Avenue Branch of the Credit Union in Sioux Falls and withdrew another $1,000 in cash. On July 16, he returned to the South Cliff Branch of the Credit Union in Sioux Falls and withdrew yet another $1,000 in cash.

[¶ 3.] At the same time B.J.T. was withdrawing thousands of dollars from the Credit Union, B.C.T. (victim), an adult with the same first and last name as B.J.T., noticed that he was missing money from his account with the Credit Union. Victim contacted the Credit Union about his missing funds and asked for copies of some of the transactions that had taken place involving his account. When a Credit Union representative pulled the transactions and showed them to victim, victim claimed that they were not his.

[¶ 4.] Victim's contact with the Credit Union led to an internal investigation and a report to law enforcement that the Credit Union had lost $10,100 because of the withdrawals from victim's account. On July 23, 2004, a Sioux Falls police detective interviewed B.J.T. and his stepmother about the matter. B.J.T. conceded receiving a statement from the Credit Union on which he had noticed a large balance, but explained that he believed his mother had deposited funds in his account from an insurance settlement over an automobile accident in which he had been injured. He further explained that he made the cash withdrawals from the Credit Union in connection with an automobile purchase and a loan to his brother. The detective informed B.J.T. that the money he withdrew really belonged to victim and that he needed to contact the Credit Union to sort the matter out. The detective further informed B.J.T. that if he paid the money back that could be the end of the matter.

[¶ 5.] B.J.T. never contacted the Credit Union about paying back its money. On August 2, 2004, the State filed a petition alleging B.J.T. to be a delinquent child based upon an underlying charge of grand theft under SDCL 22–30A–6:

> Any person who comes into control of property of another that he knows to have been lost, estrayed, mislaid, or delivered under a mistake as to the nature or amount of the property or the identity of the recipient, is guilty of theft if, with intent to deprive the owner thereof, he fails to take reasonable measures to restore the property to a person entitled to have it.

An adjudicatory hearing was held on December 2, 2004 and the juvenile court adjudicated B.J.T. a delinquent. B.J.T. was committed to the juvenile detention center for ninety days with seventy days suspended. He was further placed on supervised probation for six months and thereafter on case service monitoring for six months on various terms and conditions including payment of restitution to the Credit Union. B.J.T. appeals.

## ISSUE

**[¶ 6.] Did the juvenile court err in adjudicating B.J.T. a delinquent?**

[¶ 7.] B.J.T. argues that the juvenile court erred in adjudicating him a delinquent because the evidence was insufficient to support the adjudication. This Court reviews the sufficiency of the evidence to support an adjudication of delinquency according to the same standards used in reviewing the sufficiency of the evidence to support a criminal conviction. *See* Matter of S.F.H.R., 292 N.W.2d 802, 803–804 (S.D.1980)(citing In re Winship, 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970)). Thus, we review the evidence and the most favorable inferences that can be drawn therefrom in a manner supporting the trial court's decision and determine whether there was sufficient evidence for the court to find that the State's allegations were true beyond a reasonable doubt. *Id. See also* SDCL 26–7A–86 & 26–7A–87 (allegations of petition for delinquency must be supported by evidence beyond a reasonable doubt). In our review, we give due deference to the ability of the trial court, as the ultimate fact-finder, to weigh the evidence and determine the credibility of witnesses. *S.F.H.R., supra.*

[¶ 8.] B.J.T. contends that there was inadequate proof that he took or exercised control over property belonging to the Credit Union. He argues that the evidence showed that the funds delivered to him belonged to victim and not to the Credit Union. However, the Credit Union's vice president specifically testified during the adjudicatory hearing that when it was discovered that victim's money was missing, the Credit Union had to credit his account and then filed a bond claim with its insurer for the loss. This practice was consistent with the rule cited by the State that, generally, "a bank, in paying a forged check, must be considered as making the payment out of its own funds." *Central Nat. Bank of Richmond v. First & Merchants Nat. Bank,* 171 Va. 289, 198 S.E. 883, 889 (1938). South Dakota has recognized its own version of this rule. *See Flaherty v. Bank of Kimball,* 75 S.D. 468, 471, 68 N.W.2d 105, 107 (1955)(bank must bear loss for paying a forged or altered check). *See also* SDCL 57A–3–401(a) & 57A–3–403(a)(person not liable on instrument unless person signed instrument and an unauthorized or forged signature is ineffective). *Accord* 12 AmJur2d *Bills and Notes* § 587 (2005)(Uniform Commercial Code initially places risk of forgeries on bank in that forged signature is wholly inoperative as that of person whose name is signed)(citing UCC § 3–403(a) (1990)). Based upon the testimony and applicable law, there was no failure of proof that B.J.T. took or exercised control over property belonging to the Credit Union.

[¶ 9.] B.J.T. next claims a lack of proof that he knew the funds he withdrew from the Credit Union were lost, estrayed, mislaid, or delivered under a mistake as to amount or identity. SDCL 22–30A–6. B.J.T. argues that the record shows that he believed the funds were from an insurance settlement and that there was no proof that he was aware that the funds were not his own.

[¶ 10.] "All elements of the crime, including intent may be established circumstantially." *State v. Moschell,* 2004 SD 35, ¶ 40, 677 N.W.2d 551, 564. "The proof of fraudulent intent need not be direct; it may be inferred from expressly proven acts of the accused and surrounding circumstances." *State v. Teutsch,* 80 S.D. 462, 466, 126 N.W.2d 112, 115 (1964).

[¶ 11.] The acts and circumstances surrounding B.J.T.'s withdrawal of funds supported the inference that he knew the funds were not his. B.J.T. testified that

he thought his Credit Union account was closed when he moved in with his father and that he had no idea that there was any money in the account. Yet, immediately after his receipt of the Credit Union statement showing an unexpected balance of thousands of dollars, he proceeded to two separate branches of the Credit Union on the same day and withdrew a total of over $8,000 in cash. Moreover, B.J.T. made those withdrawals while on notice that there was confusion involving his account. He actually received two separate account statements from the Credit Union, only one of which showed a balance in the thousands of dollars. B.J.T.'s stepmother testified that she told B.J.T. at that time that he "should find out if that money was his" and "[to] contact the bank to see where that money came from[.]" B.J.T. did not do so.

[¶ 12.] There was additional confusion over B.J.T.'s account during the actual withdrawal of funds. B.J.T.'s social security number did not match the number on the account from which he was attempting to obtain funds. While trying to resolve that issue, the teller and teller supervisor discovered that there were actually two individuals named B.T. with Credit Union accounts, one with a balance of thousands of dollars and the other with a balance of only $70. B.J.T. insisted that the smaller account was not his, that the larger balance was and that he was not going to "back off." He also stated that his stepfather was out in the car and offered to have him come in to discuss the matter. However, the evidence would later show that the stepfather was not with B.J.T. at that time.

[¶ 13.] B.J.T.'s only explanation for his actions was that he thought his mother had deposited money in his account from an insurance settlement. However, there was no reason for that belief. B.J.T. was not communicating with his mother at the time of the withdrawals and had received no information from her about a settlement. The evidence further showed that B.J.T. and his mother only met with a paralegal once about B.J.T.'s accident and never met with a lawyer about it. B.J.T. never made a court appearance in connection with a lawsuit and never discussed the lawsuit with his mother after the initial meeting with the paralegal. B.J.T. admitted during the adjudicatory hearing that he did not know what was going on with the lawsuit.

[¶ 14.] Additional facts and inconsistencies in B.J.T.'s story called his credibility into question. His mother testified during the adjudicatory hearing that B.J.T. lied to her about the circumstances of his traffic accident and who was driving his car at the time. During his interview by the Sioux Falls police detective, B.J.T. explained that he made the Credit Union withdrawals to purchase a motor vehicle from a relative for $9,000 and to loan his brother some money. During the adjudicatory hearing, however, B.J.T. claimed that he made the withdrawals to pay for three different vehicles and said nothing about a loan to his brother. The circumstances surrounding B.J.T.'s withdrawal of funds, his propensity to lie and the inconsistencies in his story supported the court's rejection of his explanation for the withdrawals and its finding that he withdrew the money knowing that it belonged to another.

[¶ 15.] B.J.T. also argues that the element of a lack of reasonable measures to restore the Credit Union's property was not established. The record shows that the only affirmative step ever taken by B.J.T. to restore the Credit Union's property was to have an attorney contact a vice president for the Credit Union to inquire as to what could be done about the situation. The vice president testified that she

instructed the attorney to have B.J.T. contact her about how the Credit Union was going to get its money back. B.J.T. never made any contact with the vice president or any other representative of the Credit Union. Thus, the element of lack of reasonable measures was established.

■ [¶ 16.] Finally, B.J.T. contends there was no evidence that he intended to deprive the Credit Union of the withdrawn funds. Like the other elements of theft, intent to deprive may be established by circumstantial evidence. *See State v. Herrald*, 269 N.W.2d 776, 779 (S.D.1978). The circumstances surrounding B.J.T.'s acquisition of funds from the Credit Union including his actions immediately after learning of the unexpectedly large balance in his account, his calculated withdrawals from various Credit Union branches at different times, his insistence to the tellers that the unexpectedly large balance was his, his lie about the presence of his stepfather and his failure to return the funds when afforded an opportunity to do so are all circumstantial evidence indicating that when B.J.T. withdrew the funds he intended to deprive the Credit Union of them.

[¶ 17.]Based upon the foregoing, the evidence was sufficient to support the juvenile court's adjudication of B.J.T. as a delinquent.

[¶ 18.] Affirmed.

[¶ 19.] GILBERTSON, Chief Justice, and SABERS, KONENKAMP, ZINTER and MEIERHENRY, Justices, participating.