GILBERTSON, Chief Justice
(dissenting).
[¶ 23.] I respectfully dissent for the reasons stated in State v. Morse, 2008 SD 66, ¶¶ 30-44, 753 N.W.2d 915, 923-27 (Gilbertson, C.J., dissenting), and State v. Jackson, 2009 SD 29, ¶¶ 29-34, 765 N.W.2d 541, 548-550 (Gilbertson, C.J., dissenting).
This Court does not retry cases de novo. Instead, we review the evidence in the light most favorable to the jury’s verdict. In a similar theft by deception case, we set forth our standard of review. ... Where conflicting evidence is present, as in this case, and the credibility of witnesses is in issue, then it is a *139 question of fact for the jury. The jury is physically present at the trial and, therefore, in the best position to judge the demeanor and credibility of the witnesses. This standard of review is vitally important in a theft by deception case, because rarely, if ever, will a defendant get on the stand and announce that he or she had the specific intent to defraud. “The proof of fraudulent intent need not be direct; it may be inferred from expressly proven acts of the accused and surrounding circumstances.” People ex rel. BJT, 2005 SD 123, ¶ 10, 707 N.W.2d 489, 492 (quoting State v. Teutsch, 80 S.D. 462, 466, 126 N.W.2d 112, 115 (1964)).
Morse, 2008 SD 66, ¶ 31, 753 N.W.2d at 923-24 (citations omitted) (emphasis added).
[¶ 24.] As in Morse and Jackson, the Court eschews the jury’s ability to consider the demeanor and credibility of the witnesses and to draw conclusions about the defendant’s specific state of mind and intent from the evidence. The Court supplants the jury’s conclusions with its own by re-weighing the evidence and improperly disregarding evidence put before the jury.
[¶ 25.] The jury could have reasonably inferred from the evidence that Kessler did not intend to ever complete the project, but instead sought to take draws from the Hemmers for his personal financial gain. While the Court relies heavily on Kessler’s self-serving statements that he always intended to complete the second home, the jury is the proper judge of his credibility. The jury was free to disregard his stated intent and instead infer that he had planned to dupe the Hemmers from the beginning. The Court appears to reason that simply because Kessler had performed some of the construction, or because he completed the first home, he must not have intended to defraud the Hemmers when he agreed to build the second home. However, this is not a necessary conclusion; Kessler could have performed some of the work on the second home, and intended to defraud the Hemmers. The jury found that he did so intend.
[¶ 26.] The jury heard evidence that Kessler had a number of previous construction projects where he had failed to complete the project, and from which he had received significant amounts of money for his personal financial interests. These other projects established a common scheme for Kessler to enter into construction projects, receive money over a period of time, claim delays and the need for additional money, spend the money on personal debts and expenses, only partially complete the work, then walk away from the unfinished project leaving the other party in the lurch.
[¶ 27.] For example, in 2001, Kessler entered into a home construction project in Omaha, Nebraska. After Kessler received money to pay for the construction materials and labor, numerous liens were placed against the home by lumberyards and subcontractors. Rather than using the advanced money to pay for the construction, Kessler had used some of the money for his own purposes. The outstanding liens totaled approximately $104,000. Eventually, Kessler signed a $41,000 promissory note to the homeowner for repayment of monies advanced to him. Kessler had only paid $1,100 against this promissory note, signed in 2002, by the time of the instant trial, October 2008.
[¶ 28.] The Court’s statement that “There is no pattern of conduct on defendant’s part of entering into a loan agreement and absconding with the money” is misleading. See supra ¶ 15. While it is true that the Omaha project did not tech *140 nically involve a “loan,” it was a similar enough “agreement” to warrant a jury’s conclusion that this was Kessler’s scheme for deceiving the Hemmers.
[¶ 29.] The Court attempts to distinguish the legal consequence of Kessler’s contractual “duty to repay” the loan to the Hemmers from the contractual “duty to perform services” present in Morse and Jackson. See supra ¶¶ 12-14, ¶ 16 n. 3. This should be a distinction without a difference; under SDCL 22-30A-3(l) we are concerned with the promissor’s specific intent to obtain property of another by deception, regardless of whether that deception is accomplished by a false promise to repay or a false promise to perform. The Court appears to suggest that if one borrows money with no specific repayment date, the “obligation to repay” that loan precludes any criminal liability, irrespective of the borrower’s intent never to repay. See supra ¶ 14. This is an invalid basis for disregarding the State’s evidence. See supra ¶ 16, n. 3. Furthermore, Kessler has not appealed from the circuit court’s admission of this evidence; the Court makes this argument sua sponte. The Court’s disregard of this evidence simply reflects its effort to override the jury’s decision and retry the evidence.
[¶ 30.] In the instant transaction, the Construction Loan and Escrow Agreement for the second home was signed on August 15, 2007. This agreement provided up to $199,900 to Kessler from the Hemmers. Kessler received approximately $141,000 under this agreement by early October 2007. The bank account where Kessler had deposited the money was overdrawn by October 7, 2007. Because he had not used this money to build the second home, he was unable to complete the project. In fact, Kessler asked for an additional $35,000 from the Hemmers the day before they discovered that the house was nowhere near complete. The Hemmers, quite reasonably, refused to “loan” another $35,000 to Kessler. The evidence showed that Kessler never provided an accounting of his spending to the Hemmers until after they had visited the construction site and refused to loan him any more money. By his own accounting, of the $198,681.66 Kessler had borrowed, only $72,746 went toward construction expenses. The remaining $126,000 went toward his personal expenses. Kessler admitted that he had no other source of income; he had no means of either repaying the loan or finishing the home.
[¶ 31.] Given this evidence, and the evidence of Kessler’s previous schemes, the jury could have reasonably inferred that, at the time Kessler entered into the agreement in August 2007, he did not intend to repay the loan but to deposit it into a bank account and spend it all within two months. He then continued the fagade, seeking to get more money from the Hemmers, until they actually visited the work-site and discovered his deception. These inferences are neither unreasonable, nor are they “inferred from the fact alone that [Kessler] did not subsequently perform the promise.” See SDCL 22-30A-3(1) (emphasis added).
[¶ 32.] The Court correctly states that “The statute under which defendant was charged does not criminalize defaulted loans.” See supra ¶ 18. However, while this statement is true, it misses the more salient point; the statute does criminalize entering into a loan with the specific intent to default on it. That is what Kessler was convicted of by the jury. The jury’s verdict should be upheld as required by our standard of review. The circuit court did not err in denying Kessler’s motion for a judgment of acquittal.
[¶ 33.] I dissent.
*141 [¶ 34.] I also join the dissent of Justice Zinter.