#24805-rev & vacate-SABERS, Retired Justice

**2009 SD 29**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

* * * *

STATE OF SOUTH DAKOTA,                              Plaintiff and Appellee,

v.

KENT JACKSON,                                       Defendant and Appellant.

* * * *

APPEAL FROM THE CIRCUIT COURT OF
THE SEVENTH JUDICIAL CIRCUIT
PENNINGTON COUNTY, SOUTH DAKOTA

* * * *

HONORABLE MERTON B. TICE, JR.
Judge

* * * *

LAWRENCE E. LONG
Attorney General

TODD A. LOVE
ANDREW KNECHT
Assistant Attorneys General
Pierre, South Dakota                          Attorneys for plaintiff
                                              and appellee.

THOMAS M. DIGGINS
Pennington County Public
 Defender's Office
Rapid City, South Dakota                      Attorneys for defendant
                                              and appellant.

* * * *

ARGUED FEBRUARY 17, 2009

OPINION FILED **04/22/09**

#24805

SABERS, Retired Justice.

[¶1.]    After Kent Jackson failed to complete the installation of a roof on

Gary Epperson's business, the State charged him with grand theft by deception.

Jackson moved for judgment of acquittal after the State rested its case-in-chief.

The motion was denied.  A jury convicted him of the crime, prompting Jackson to

again move for a directed verdict, but it was denied a second time.  Jackson appeals.

We reverse.

**FACTS**

[¶2.]    Jackson embarked upon a roofing career in 1995.  His business, based

out of Pierre, South Dakota, was a sole proprietorship from 1995 until 2000, when it

was incorporated under the name Four Seasons Roofing Corporation (Four

Seasons).  Four Seasons was engaged in installing various types of roofs, including

polyurethane foam roofs.  Four Seasons purchased polyurethane foam roofing

materials from the Conklin Company (Conklin) based out of Minnesota.[1]

[¶3.]    After seeing Four Season's advertisement in the yellow pages,

Epperson contacted Jackson in March of 2002 to install a Conklin[2] roof on his

business, the St. Joe Antiques Mall (Mall), located in Rapid City.  At the time, the

---

1.    The Conklin Company is a chemical manufacturing company with several
      different product lines, including roofing products.  Jackson began ordering
      materials from Conklin in 1997.  In order to warranty the roofs, Jackson
      completed Conklin's three-day training program.  Furthermore, on May 13,
      2002, Jackson achieved the status of sales manager with the company.  A
      Conklin representative testified that the status of sales manager was based
      on the number of people Jackson brought into the company and the volume of
      product sold.

2.    Epperson specifically wanted a Conklin-brand roof because of the warranty.

Mall had an asphalt roof covered with gravel. Jackson drove to Rapid City to inspect, diagram, and measure the roof. Upon doing so, Jackson contacted Conklin to get an estimate for the cost of materials based on his mock order. Thereafter, Epperson, on behalf of the Mall, and Jackson, on behalf of Four Seasons, negotiated the price of the contract at $24,500, with fifty percent down.[3] The proposal was signed on April 8, 2002,[4] and a check for $12,250 was deposited into Four Seasons' business account on April 10, 2002.[5] The contract indicated that the down payment would be used for materials, however, Epperson testified that he knew the down payment would not cover the total cost of materials.

[¶4.]    Installation of the new roof involved three stages: (1) removal of the gravel on the existing roof; (2) application of the polyurethane foam; and (3) application of a basecoat and topcoat on top of the foam. Completion of all the stages required warm, dry conditions with minimal winds. Epperson claims he told

---

3.    The original bid was for $25,750, with seventy percent down.

4.    Some of the terms not included in the written agreement are disputed. During the contract negotiations, Epperson told Jackson that he had access to a dump truck, which would be needed to transport the gravel removed from the existing roof to Epperson's personal residence. At a later time, Epperson informed Jackson that he would no longer provide the dump truck. It is disputed whether this latter conversation occurred before or after the contract was signed. Jackson claims that Epperson relayed this information to him after the contract was signed, causing Jackson to prepare a change order in writing to cover the cost of renting a dump truck. Epperson refused to pay the additional costs when Jackson presented him with the change order invoice.

5.    Twelve thousand dollars ($250 was received in cash) was deposited into Jackson's business account on April 10, 2002. Immediately prior to this deposit, the account balance was $10.33. Thereafter, the account balance fluctuated, but was more than $12,250 in August 2002.

Jackson that he wanted the roof completed by the end of the summer. However, there was no completion date or indication that time was of the essence in the contract. Jackson testified that he informed Epperson of other contracts needing to be completed before starting on the Mall's roof. The record indicates that Four Seasons had several roofing contracts during the spring, summer, and fall of 2002.

[¶5.] Jackson testified that precipitation in the spring months of 2002 delayed the first stage of the roofing project. On June 24, 2002, Four Seasons rented a dump truck and hired temporary workers to assist in removing the gravel from the roof, which took two days. After the gravel was removed, tools, including brooms and a wheelbarrow, remained on the roof of the Mall.

[¶6.] Epperson admitted that, at the time the contract was formed, Jackson told him that Four Seasons did not currently own the machine needed to spray the polyurethane foam. Jackson told Epperson that he planned to either purchase a machine or subcontract the work. After Four Seasons lost the bid for another contract, it was unable to obtain financing to purchase the equipment. On June 1, 2002, Jackson advised Epperson of Four Seasons' inability to purchase a new machine, but told Epperson that he was attempting to borrow or rent the equipment.

[¶7.] In July 2002, Four Seasons arranged to rent the necessary equipment from Sunway Homes in Annandale, Minnesota. Four Seasons planned to purchase

the polyurethane foam from Conklin on the trip to obtain the equipment.[6] Jackson rented a trailer in Rapid City on July 14, 2002, and then commenced the trip to Minnesota. Between Rapid City and Pierre, Jackson's truck encountered transmission problems, preventing him from completing the trip. The next day, Jackson informed Epperson and Sunway Homes of the unexpected vehicle malfunction. Jackson's truck was repaired on July 25, 2002. By that time, however, the equipment at Sunway Homes was no longer available.

[¶8.] On September 3, 2002, Epperson filed a complaint with the Rapid City Police Department, alleging that Jackson failed to fulfill his contractual obligations. A Pennington County state's attorney contacted Jackson to discuss the allegations. Jackson explained why he had not completed the roof, but assured the state's attorney that he intended to complete it as soon as possible. The Pennington County State's Attorneys Office chose not to prosecute Jackson, determining that it was a civil, not criminal, matter.

[¶9.] In November 2002, Jackson purchased a foam machine in Texas. By that time of the year, however, the weather conditions were not amenable to completing the installation. Jackson wrote Epperson a letter, informing him of the purchase, and told him that the Mall roof would be the first contract completed the following spring. Despite that notice, Epperson contracted with Black Hills Roofing to have the roof completed in early spring 2003.

---

6. Jackson testified that, because the foam had to be maintained within a certain temperature range and to avoid storage costs, he delayed purchasing it until he knew that it would be used in the immediate future.

[¶10.]     Epperson later filed a complaint with the Attorney General's Office. A Division of Criminal Investigation agent investigated the matter. During a November 3, 2004 telephone conversation, Jackson explained to the agent that Epperson had filed a civil lawsuit against him, but that the debt was discharged after Four Seasons filed Chapter 7 bankruptcy on March 5, 2004.[7] The civil lawsuit was dismissed in 2006.

[¶11.]     On July 20, 2006, the State charged Jackson by indictment with grand theft by deception in violation of SDCL 22-30A-3(1-2). Jackson entered a plea of not guilty at his September 8, 2006 arraignment.

[¶12.]     On April 18, 2007, the trial court held a motion hearing on the issue of the admission of other acts evidence relating to a roofing contract KLD Enterprises (KLD) had formed in 2005 with Thomas King, the owner of King's Inn Hotel in Pierre.[8] While the State argued that the other acts were a "mirror image" of the

---

7.  In his brief, Jackson states that in Schedule F of the bankruptcy filing, Four Seasons listed Epperson's business, Epperson Enterprises, as a creditor, as well as the attorney for Epperson Enterprises, Alan L. Smoot. Neither Epperson nor Smoot appeared at the creditors meeting to object to the discharge of the debt, nor did they plead or allege in the bankruptcy proceedings that the debt was nondischargeable due to fraud.

8.  At the time of the contract with King, Jackson was an employee of KLD, his father's business. This contract, formed in August 2005, was also for the installation of a polyurethane foam roof. The contract did not include a completion date or language indicating that time was of the essence. At the time the contract was formed in August 2005, Jackson had the equipment to apply the topcoat and basecoat, but did not have the equipment to apply the foam. Jackson sold his foam machine in May 2005 as it no longer met EPA requirements. The evidence is disputed whether Jackson informed King of this at the time the contract was formed. When King later learned that KLD did not own the equipment, Jackson told King that he was in the process of either getting the proper equipment or hiring a subcontractor. Furthermore,

(continued . . .)

instant allegations, Jackson responded by contending that this evidence was not relevant, served no proper purpose and did not show intent with regard to the 2002 allegation. Jackson further contended the evidence was offered for its likely prejudicial effect upon the jury. The trial court decided to allow the other acts evidence for the purpose of showing intent and/or common plan or scheme.[9]

[¶13.]     The case was tried before a jury in a three-day trial beginning on May 7, 2007. After the State rested its case-in-chief, Jackson made a motion for judgment of acquittal on the ground that the State failed to prove specific intent. The motion was denied. Upon conclusion of the trial, the jury returned a guilty

_____

(. . . continued)
> right after the contract was formed, Jackson removed the gravel from the existing roof of the King's Inn, and a few weeks later, KLD purchased the spray foam from Foam Enterprises. When Jackson did not have the roof finished by the end of October 2005, King filed a civil law suit. A settlement was reached in May 2007.

9.     At the conclusion of the hearing, the court stated,

> It's the opinion of this [c]ourt that the facts are similar in the nature as alleged, that they – though the issue of intent becomes clear as far as its issue being probative, common plan and scheme, the [c]ourt would find that there is a basis upon which this could proceed. Regardless of who is the corporate entity, it's the defendant's conduct that occurred in both of these cases that we are dealing with, not with other agents of the corporation and not with something that was allegedly not within the knowledge of the defendant, Mr. Jackson. Therefore, I will allow the State to offer the evidence under 404(b).

> The court did not orally make a record of its balancing analysis of the probative value and prejudice. However, a balancing analysis was set forth in court's findings of facts and conclusions of law, but those were not entered into the record until June 21, 2007, well after the trial was completed.

verdict. Jackson filed a written motion for judgment of acquittal. The motion was again denied.

[¶14.] In June 2007, Jackson was sentenced to four years in the state penitentiary. The sentence was suspended upon imposition of four years probation, provided that certain conditions were met. Two months later in August, the court considered the issue of restitution. Jackson argued that the debt had been discharged in bankruptcy proceedings and that the State may have violated federal law by prosecuting him. Alternatively, Jackson argued that the trial court should credit him for the work performed and funds expended. In a letter dated January 16, 2008, the trial court decided that Jackson would be held personally liable for restitution to Epperson. Jackson timely filed his notice of appeal, raising three issues:

1. Whether the trial court erred in denying Jackson's motions for judgment of acquittal.

2. Whether the trial court erred in allowing the State to present other acts evidence.

3. Whether the trial court erred in ordering Jackson to pay restitution where the debt of Jackson's corporation, Four Seasons, was previously discharged in bankruptcy proceedings.

## STANDARD OF REVIEW

[¶15.] In *State v. Swalve*, we reiterated the standard of review for a trial court's denial of a defendant's motion for judgment of acquittal:

> In determining whether a trial court erred in denying a defendant's motion for judgment of acquittal, "[o]ur inquiry is whether the State set forward sufficient evidence from which the finder of fact could reasonably find the defendant guilty." State v. Boston, 2003 SD 71, ¶6, 665 NW2d 100, 103 (citing State v. Gonzalez, 2001 SD 47, ¶7, 624 NW2d 836, 838). "A guilty

verdict will not be set aside if the [S]tate's evidence and all favorable inferences that can be drawn therefrom support a rational theory of guilt." State v. Phair, 2004 SD 88, ¶16, 684 NW2d 660, 665 (quoting State v. Downing, 2002 SD 148, ¶22, 654 NW2d 793, 800).

2005 SD 17, ¶5, 692 NW2d 794, 797.

[¶16.] **1. Whether the trial court erred in denying Jackson's motions for judgment of acquittal.**

[¶17.] Jackson contends the trial court abused its discretion by not directing the verdict in his favor because the State failed to prove that Jackson intended to defraud Epperson, as required by SDCL 22-30A-3. The State responds by arguing there was sufficient evidence of Jackson's intent to deceive because Jackson "purposefully led [Epperson] to believe that he had the capacity and intent to build [him] a roof" and Jackson told Epperson that the down payment "would go toward materials for the project."

[¶18.] "Theft by deception is a specific intent crime."[10] State v. Morse, 2008 SD 66, ¶12, 753 NW2d 915, 919 (citing State v. Heftel, 513 NW2d 397, 400 (SD

---

10. SDCL 22-30A-3 provides in relevant part:

> Any person who obtains property of another by deception is guilty of theft. A person deceives if, *with intent to defraud*, that person:
>
> (1) Creates or reinforces a false impression, including false impressions as to law, value, intention, or other state of mind. However, as to a person's intention to perform a promise, deception may not be inferred from the fact alone that that person did not subsequently perform the promise;
>
> (2) Prevents another from acquiring information which would affect the other person's judgment of a transaction[.]

(Emphasis added.)

1994)).  The accused must "'act willfully and with the specific intent to deceive or cheat, ordinarily for the purpose of either causing some financial loss to another or bringing about some financial gain to one's self.'"  *Id.* (quoting *Heftel*, 513 NW2d at 400).  "'It is only where [actors do] not believe what [they] purposely caused [their victims] to believe, and where this can be proved beyond a reasonable doubt, that [these actors] can be convicted of theft.'"  *Id.* (quoting State v. Hurst, 507 NW2d 918, 920 (SD 1993) (quoting Model Penal Code § 223.3 cmt 3(b))).  "[T]he specific intent to defraud [must exist] at the time the property was received."  *Swalve*, 2005 SD 17, ¶9, 692 NW2d at 797.

[¶19.]        We recently considered this issue in *State v. Morse*, 2008 SD 66, 753 NW2d 915.  Morse agreed to do some home remodeling for Janice Heffron, to be financed by Janice's mother, Maxine.  Morse assured Janice that he could complete the remodeling in "five weeks for $5,000," "that he had plumbing experience, that his work would be above and beyond code, and that the local inspector did not inspect his work because he was so good."  *Id.* ¶3, 753 NW2d at 917.  Morse started the work in January 2006, and continued until the second week of March, when Morse was unable to continue due to a back injury.  By March, however, Maxine had paid Morse somewhere between $6,000 and $6,500 in cash.  After the second week of March, Morse stopped coming to the house and never responded to the Heffrons' phone calls, personal visits, or certified mail.  Janice contacted a licensed plumber to examine the work and estimate the cost of completing the project.  The plumber pointed out several deficiencies in Morse's work, and in the opinion of the plumber, Morse's work added no value to the home.  Thereafter, Morse was charged

with grand theft by deception, and was found guilty by a jury. He appealed to this Court, asserting the evidence was insufficient to sustain the verdict. We reversed.

[¶20.]        Based upon our review of the evidence, we held there was insufficient evidence to convict Morse of theft by deception. The facts were that Morse:

> (1) failed to complete the project in five weeks for $5,000 as promised; (2) performed work that was not "above and beyond code" as promised; (3) lied about obtaining a building permit; (4) lied about the reasons he could not get the tankless water heater installed and why the pipes were leaking; (5) returned the water heater and did not give the $186 refund to Maxine; (6) never provided Janice or Maxine receipts for materials purchased; (7) quit working on the project prematurely and without explanation; and (8) never responded to the Heffrons' attempts to contact him.

2008 SD 915, ¶17, 753 NW2d at 921. Even in light of these facts, we concluded there was no evidence that Morse had a purpose to deceive or intended to defraud the Heffrons at the time he agreed to do the work, or that Morse took Maxine's money with the intention of not performing.[11]  *Id.* ¶¶18-19, 753 NW2d at 921-22.

---

11.   In *Morse*, we highlighted several cases in which courts found the evidence sufficient to prove deceptive theft, but recognized that in those cases, "there was either circumstantial or direct evidence to establish the requisite intent." *Id.* ¶15, 753 NW2d at 920 (citing Cash v. United States, 700 A2d 1208, 1211-12 (DCCtApp 1997) ("jury could infer intent when *at the time* Cash obtained the money he had no intention to complete the work because he took the money and *never* performed") (emphasis in original); State v. Rivers, 588 NW2d 408, 412 (Iowa 1998) ("evidence suggests that when Rivers had milked the customer for as much as appeared possible, he never showed up again"); Craver v. State, 942 P2d 1110, 1114 (Wyo 1997) ("'Craver's actions were more than mere nonperformance' because he *knew* he could not perform the work and took the money after deceiving his victims that he could") (emphasis in original)). *See also Swalve*, 2005 SD 17, ¶¶9, 17, 23, 692 NW2d at 798, 799, 800 (holding that evidence was sufficient to support convictions for grand theft by deception when it could be reasonably inferred that Swalve knew that he did not have clear title to the trade-in vehicles when they were resold due to the fact that he had not yet paid off the outstanding liens on the

(continued . . .)

As Justice Zinter pointed out in his concurring opinion, "the evidence reflected nothing more than a civil dispute involving a contractor who was, for a variety of reasons, unable to competently perform." *Id.* ¶29, 753 NW2d at 923 (Zinter, J., concurring).

[¶21.]     Considering the evidence in the light most favorable to the verdict, Jackson:  (1) failed to complete the roofing project by the end of summer; (2) spent a portion of the down payment on items other than "roofing materials;" and (3) never placed an order for the foam.  This is all post-inducement conduct, however.  The State provided no evidence indicating that, at the time Jackson received the down payment from Epperson, Jackson had the intent to deceive him of his property.

[¶22.]     Nonetheless, even these pieces of evidence fail to support a guilty verdict.  First, the written contract is silent as to a completion date, or even any language indicating that time was of the essence.  Similarly, the record indicates that Jackson had informed Epperson of other contracts needing to be completed before he could start on the Mall roof.  And Epperson was well aware that certain weather conditions were required before Jackson could remove the existing gravel

---

(. . . continued)

vehicles, that he failed to pay off the outstanding liens in a timely manner, and that he failed to remit customers' payments for the extended warranties purchased through the dealership); *Phair*, 2004 SD 88, ¶17, 684 NW2d at 665-66 (concluding that because Phair was aware that she was required to give the bank a lien against the car, and yet represented to another lender that there were no liens on the vehicle, "the jury could have found that Phair acted with intent to defraud by intentionally misrepresenting the lien status of the vehicle"); *Hurst*, 507 NW2d at 921 (holding that evidence was sufficient to support the deceptive theft charge because the defendants' "plan was to bury the waste on Vollmer's property and yet they purposely caused MDS to believe that the waste would be incinerated properly").

and apply the foam, basecoat, and topcoat. Evidence was presented that weather conditions during this time prevented Jackson from working on certain days. Moreover, SDCL 22-30A-3(1) states that "as to a person's intention to perform a promise, deception may not be inferred from the fact alone that that person did not subsequently perform the promise[.]" The mere fact that Jackson failed to complete the roof is not sufficient evidence to convict him of this crime.

[¶23.]    The second and third pieces of evidence are interrelated, and therefore will be considered together. The State claims that Jackson's intent to deceive is proven by the fact Jackson did not use the entire down payment to purchase materials for the roof, because several weeks after the down payment was deposited, the account balance was reduced by nearly $5,000. The State fails to recognize that at times the account balance exceeded the down payment amount. The fact is that, at least in 2002, Jackson was operating a busy roofing business with many outstanding contracts, causing cash to flow both into and out of the account. Moreover, Jackson testified that due to the temperature requirements of maintaining the foam, he could not purchase it until he was ready to apply it in the near future. Lastly, Jackson also testified that $5,000 of the down payment was profit. The fact that Jackson neither depleted the account, nor spent more than his profit, supports our decision that there was insufficient evidence to prove the requisite intent at the time the down payment was received.

[¶24.]    All of the other evidence indicates that Jackson had the intention to complete the job. After receiving the down payment, Jackson: (1) hired temporary workers to remove the gravel from the existing roof; (2) rented a dump truck to

transport the gravel to Epperson's personal residence; (3) left tools on the roof possibly indicating an intention to return; (4) contacted various people to rent a foam machine; (5) rented a trailer to pick up a foam machine and the required foam in Minnesota; (6) after encountering transmission problems, contacted Epperson to inform him of the unexpected delay; (7) kept in contact with Epperson, whether it was by telephone, letter, or in person; (8) purchased and picked up a $7,000 foam machine in Texas; (9) informed Epperson that his roof would be the first completed the following spring; (10) continued the Four Seasons advertisement in the yellow pages; and (11) satisfactorily completed roofing contracts before and after the Epperson contract. Even though it is not determinative of the issue, not a single witness testified that Jackson ever stated that he did not plan to complete the roof installation. Compared to *Morse*, the evidence in this case is even less sufficient to prove the intent element of grand theft by deception.

[¶25.] We hold that the State failed to set forth sufficient evidence from which the finder of fact could reasonably find that Jackson had specific intent to deceive. Jackson's misfortune of bad luck, unavoidable delays, and perhaps not the ideal characteristics of a businessman do not equate to a specific intent to deprive Epperson of his money. The trial court erred in denying Jackson's motions for judgment of acquittal because the State's evidence and all favorable inferences that can be drawn therefrom do not support a rational theory of guilt. Therefore, we reverse the trial court and vacate the judgment ordering Jackson to pay restitution. Because we reverse on Issue 1, we do not reach Issues 2 and 3.

[¶26.] Reversed and vacated.

[¶27.]        KONENKAMP, ZINTER, and MEIERHENRY, Justices, concur.

[¶28.]        GILBERTSON, Chief Justice, dissents.

GILBERTSON, Chief Justice (dissenting).

[¶29.]        I respectfully dissent for the reasons stated in State v. Morse, 2008 SD 66, ¶¶30-44, 753 NW2d 915, 923-27 (Gilbertson, C.J., dissenting).

> This Court does not retry cases de novo.  Instead, we review the evidence in the light most favorable to the jury's verdict.  In a similar theft by deception case, we set forth our standard of review. . .  Where conflicting evidence is present, as in this case, and the credibility of witnesses is in issue, then it is a question of fact for the jury.  The jury is physically present at the trial and, therefore, in the best position to judge the demeanor and credibility of the witnesses.  This standard of review is vitally important in a theft by deception case, because rarely, if ever, will a defendant get on the stand and announce that he or she had the specific intent to defraud.  *"The proof of fraudulent intent need not be direct; it may be inferred from expressly proven acts of the accused and surrounding circumstances."*  People ex rel. BJT, 2005 SD 123, ¶10, 707 NW2d 489, 492 (quoting State v. Teutsch, 80 SD 462, 466, 126 NW2d 112, 115 (1964)).

*Id.,* 2008 SD 66, ¶31, 753 NW2d at 923-24 (citations omitted) (emphasis added).

[¶30.]        The majority opinion eschews the jury's ability to consider the demeanor and credibility of the witnesses and to draw conclusions from the evidence based on these factors.  The majority opinion does not draw favorable inferences from the evidence in support of the *jury's* conclusion regarding these circumstances, as required by our standard of review.  *See supra* ¶15.  Instead, it replaces the jury's physical presence in the courtroom with its own reevaluation of the evidence from a cold reading of the record.  *See supra* ¶¶22-24.  While reconsidering the evidence, the majority opinion is particularly deferential to Jackson's position, especially on the "profit" and "intent" issues.  *See supra* ¶23

-14-

("Jackson also testified that $5,000 of the down payment was profit." Jackson's credibility is the province of the jury and the "profit" was not actual profit, as discussed below.); ¶24 ("All of the other evidence indicates that Jackson had the intention to complete the job.") The majority opinion supplants the jury's conclusions regarding intent and witness credibility with its own.

[¶31.] The evidence indicates that Jackson took his "profit" out of Epperson's proceeds before performing the work.

> profit, *n.* 1. The excess of revenues over expenditures in a business transaction;
> . . .
> *gross profit.* Total sales revenue less the cost of the goods sold, no adjustment being made for additional expenses and taxes.
> . . .
> *net profit.* Total sales revenue less the cost of the goods sold and all additional expenses.
> . . .
> *paper profit.* A profit that is anticipated but not yet realized.
> . . .
> *unrealized profit.* See *paper profit.*

*Black's Law Dictionary* (8th ed. 2004), profit. Jackson incorrectly estimated the "profit" to be received from this project. After he had withdrawn $5,000 of Epperson's down payment, Four Seasons had insufficient funds available to pay the *expenditures* or *costs* of the project. Even though he considered the $5,000 to be "his," Jackson and Four Seasons had not yet *realized* the profit. Jackson did not return this unrealized profit to the business in order to make up for the deficiency. Since that time, he has maintained his personal right to these "profits."

[¶32.] The jury heard evidence that Jackson requested a 70% down payment, and that the 50% Epperson eventually put down was, according to his belief, to go toward the purchase of materials. In the twenty days between the deposit of

Epperson's money in Four Season's bank account and the $5,000 "profit" withdrawal for his personal use, no other deposits were made into the account. Considering all of the surrounding circumstances, the jury could have reasonably concluded that Jackson specifically intended, at the time the contract was made, to get as much money as possible from the victim and then withdraw the money for his personal use, with no intent to fully perform.

[¶33.] The jury's finding is not unsupported simply because the circumstantial evidence of Jackson's *initial* intent was only ascertainable from events and conduct that occurred *after* the deceit had been accomplished. *See supra* ¶21.[12] Later acts are as much a part of the "surrounding circumstances" as acts and statements made prior to the deception. Furthermore, Jackson's non-performance was not the *only* fact presented by the State to support the theory of guilt. *See supra* ¶22.[13] The majority opinion simply disregards the other evidence in deference to Jackson's view of the case, to the detriment of the jury's verdict.

---

12. The evidence also includes testimony regarding a later roofing contract entered into by Four Seasons. In this later contract, Jackson artificially inflated the contract bid, at the buyer's request, in order to allow the buyer to obtain a greater loan from a bank. Jackson was paid the inflated amount, then returned the excess to the buyer. Jackson received $1,000 in payment from the buyer for his participation in this scheme. This evidence was admitted at trial under Rule 404 (b). The jury could have used this evidence to conclude that the Four Seasons business was a front – a common plan or scheme for Jackson to obtain illicit money.

13. The majority opinion states: "[e]vidence was presented that weather conditions during this time prevented Jackson from working on certain days." *See supra* ¶22. The contract was signed in early April 2002. Jackson had not completed the installation by November 2002 when Epperson hired another company to finish the roof work. The jury was justified in rejecting any argument that there were insufficient days throughout the entire spring,

(continued . . .)

[¶34.]        I dissent.

_____
(. . . continued)
        summer, or fall of 2002 to provide weather conditions favorable for roof installation, or that some other problem prevented Jackson from working.