#25031-r-JKK

**2009 SD 76**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

\* \* \* \*

STATE OF SOUTH DAKOTA,                                   Plaintiff and Appellee,

    v.

JEROME D. KESSLER,                                   Defendant and Appellant.

\* \* \* \*

APPEAL FROM THE CIRCUIT COURT
OF THE THIRD JUDICIAL CIRCUIT
LAKE COUNTY, SOUTH DAKOTA

\* \* \* \*

HONORABLE TIM D. TUCKER
Judge

\* \* \* \*

LAWRENCE E. LONG
Attorney General

STEVEN R. BLAIR
Assistant Attorney General                          Attorneys for plaintiff
Pierre, South Dakota                                and appellee.

MANUEL J. de CASTRO, JR. of
de Castro Law Offices, PLLC                         Attorney for defendant
Madison, South Dakota                               and appellant.

\* \* \* \*

CONSIDERED ON BRIEFS
ON MAY 26, 2009

OPINION FILED **08/19/09**

#25031

KONENKAMP, Justice

[¶1.] A jury found defendant guilty of aggravated grand theft by deception and he appeals. Because there was insufficient evidence that defendant intended to deceive his victims at the time he entered into a loan agreement or accepted loan proceeds, we reverse.

## Background

[¶2.] Defendant Jerome Kessler met Sharon and Eugene Hemmer sometime in 2005, while defendant was handing out fliers advertising his construction business. The Hemmers hired defendant to do handyman work, and throughout the next year, he completed two projects for them. The Hemmers were satisfied with defendant's efforts and paid him. In 2006, the Hemmers again hired defendant, and paid him for the work he completed. In the fall of 2006, defendant told the Hemmers that he had incurred some legal bills and wanted to know if he could borrow money in exchange for doing work. They loaned him $3,500. Defendant never repaid the loan, but completed certain repairs in the summer of 2007 without requesting payment.

[¶3.] Also in the fall of 2006, defendant asked the Hemmers if they would finance his construction of a "spec house."[1] Defendant did not believe he could obtain financing through a bank. He proposed that they would loan him a certain amount, which he would later repay with interest. The Hemmers agreed, and the parties entered into a contract and escrow agreement. The contract provided that

---

1. A "spec house" is built for sale with no specific purchaser in mind. *See* Jutting v. Hendrix, 2000 SD 25, ¶3 n2, 606 NW2d 140 n2.

-1-

defendant would take periodic draws for a total of $169,000 to build a house in Brookings County, South Dakota. Upon sale of the house, he would repay the Hemmers $169,000, plus 10% interest. The contract contained an attached document setting forth the schedule of draws and interest. Throughout the remainder of 2006, and into the summer of 2007, defendant took draws in accord with the contract and constructed the home. In July 2007, defendant repaid the Hemmers $177,260.83 ($169,000, plus 10% interest).

[¶4.] Sometime in May 2007, Gene Hemmer agreed to finance another "spec house" for defendant to build in Brookings County. They executed a second contract substantially similar to the first, dated August 15, 2007. One difference was an increase in the loan amount: $199,990. Another difference was the absence of an attached schedule of anticipated draws and interest. Nonetheless, as with the first agreement, defendant obtained periodic draws on the loan from the Hemmers. Noted on some of the checks were the words "loan" or "draw." Sharon Hemmer was not always present when defendant received the draws. The last four times defendant requested money, Gene was extremely ill and Sharon signed defendant's requested draws. According to Sharon, when defendant would request a draw, she or Gene would ask how the house was coming. Defendant would usually respond, "The house is going well."

[¶5.] On February 6, 2008, defendant met with the Hemmers. The meeting was held in part to discuss a contract for deed arrangement between the parties.[2] At this meeting, defendant requested a draw of $35,000 for the second Brookings home. According to Sharon, Gene asked defendant if he was inside the house finishing up, to which defendant responded, "Yes." The Hemmers were concerned about the amount of money defendant had already drawn and asked him how much he had received. Defendant responded that he had already drawn approximately $220,000. The Hemmers refused to give defendant his requested $35,000.

[¶6.] The next day, Sharon went to Brookings to check on the progress of the house. When she saw it, she was shocked that it had no roof, no windows, and appeared to her to be a house just beginning construction. Sharon contacted defendant and her attorney, David Jencks. That evening, February 7, 2008, defendant met with the Hemmers and Jencks at the Hemmers' home. Sharon asked defendant to account for where the money had gone, to which he responded that he had no written accounting. Defendant admitted that the money was spent on things other than the construction of the house. He also admitted that he had lied to the Hemmers on the progress of the house, concerned that the Hemmers would be upset. Nonetheless, at all times defendant repeated that he intended to complete the construction and gave no indication that he did not intend on repaying the loan.

---

2. At the time, defendant had been living at a residence on the Hemmers' acreage outside of Wentworth. Defendant was living there as part of an agreement that he would buy the acreage through a contract for deed.

[¶7.]     On February 8, 2008, defendant gave the Hemmers a written accounting, which showed that he had drawn $198,681.66 for the house. The accounting indicated that only $72,746 went to construction, while the rest went to other items, including defendant's personal obligations, e.g., child support. Defendant told the Hemmers that he needed another $103,828 to finish the house. The Hemmers refused to give defendant any more money, since their own accounting revealed that defendant had drawn $216,000.

[¶8.]     Despite not receiving any additional money, between February 8 and February 14, defendant continued to work on the house. In the meantime, however, attorney Jencks contacted Lake County Deputy Sheriff Tim Walburg. Jencks reported that defendant had stolen over $100,000 from the Hemmers. Deputy Walburg met with the Hemmers and visited the Brookings construction site. In Deputy Walburg's videotaped interview of defendant, defendant maintained that he intended on finishing the house and that the reason he was so behind was due to poor management of his money and anxiety problems.

[¶9.]     The Hemmers stopped defendant from working on the house and sold it for $99,000. Defendant was indicted of aggravated grand theft by deception in violation of SDCL 22-30A-3(1).[3] Under SDCL 22-30A-17.1, "Theft is aggravated

_____

3.     SDCL 22-30A-3(1) provides:

> Any person who obtains property of another by deception is guilty of theft. A person deceives if, with intent to defraud, that person:
>
> (1) Creates or reinforces a false impression, including false impressions as to law, value, intention, or other state of mind. However, as to a person's intention to perform a promise, deception

(continued . . .)

-4-

grand theft, if the value of the property stolen exceeds one hundred thousand dollars." A jury trial was held in October 2008. Defendant was found guilty. He was sentenced to ten years imprisonment, with seven suspended, on the conditions that he pay restitution plus attorney's fees and have no contact with the Hemmers. Defendant appeals asserting that the court erred when it denied his motion for a judgment of acquittal based on the State's failure to (1) prove venue under SDCL 23A-16-3, (2) establish identification, and (3) set forth sufficient evidence.

### Analysis and Decision

[¶10.] Our review of a denial of a motion for a judgment of acquittal is a question of law examined de novo. State v. Packed, 2007 SD 75, ¶17, 736 NW2d 851, 856 (quoting State v. Disanto, 2004 SD 112, ¶14, 688 NW2d 201, 206 (citing United States v. Staula, 80 F3d 596, 604 (1stCir 1996))). "We must decide anew whether the evidence was sufficient to sustain a conviction." *Disanto*, 2004 SD 112, ¶14, 688 NW2d at 206 (citations omitted). "In measuring evidentiary sufficiency, we ask 'whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Id.* (quoting Jackson v. Virginia, 443 US 307, 319, 99 SCt 2781, 2789, 61 LEd2d 560 (1979)).

[¶11.] We recently examined a sufficiency of the evidence question in a theft by deception conviction in *State v. Morse*, 2008 SD 66, 753 NW2d 915, 919. There,

_____

(. . . continued)

        may not be inferred from the fact alone that that person did not
        subsequently perform the promise. . . .

and in a subsequent case, *State v. Jackson*, we ruled that there must be evidence of a purpose to deceive or an intent to defraud at the time the property or money is obtained. *Id.* ¶12; *see also* 2009 SD 29, ¶18, 765 NW2d 541, 545-46. As we recognized in *Morse*, intent to defraud "'means to act willfully and with the specific intent to deceive or cheat, ordinarily for the purpose of either causing some financial loss to another or bringing about some financial gain to one's self.'" 2008 SD 66, ¶12, 753 NW2d at 919 (citation omitted).

[¶12.]     This case is not comparable to *Morse* or *Jackson*. In those cases, the defendants obtained money from another based on a promise to complete certain construction work. The money was paid to Morse and Jackson with no expectation for repayment. Rather, Morse and Jackson were paid based on their promises to perform their agreed-upon work. When Morse and Jackson did not complete the work as promised, theft by deception charges ensued and convictions were obtained. On appeal, we found insufficient evidence to sustain the theft by deception convictions because there was no evidence in either case that at the time Morse or Jackson obtained the money that they intended to deceive.

[¶13.]     Here, defendant was not paid any money based on his promise to complete certain construction work. He was loaned money under a loan contract, which money, plus interest, was due regardless of defendant's completion of the construction work. That this situation involved a loan contract, rather than monies paid based on a promise to perform certain construction work, is further evident based on the fact that the Hemmers' loan to defendant was secured to a certain

extent by the real estate the home was being constructed on.[4]  When defendant

purchased the land, it was titled in the name of the Hemmers' trust.

[¶14.]      Defendant's obligation to repay the Hemmers existed regardless of

whether he completed construction on the home.  He was building the house for his

own profit.  The Hemmers' profit would come from the interest defendant would pay

on the loan.  There was no specific date in the contract by which defendant was

required to repay the Hemmers.  Most importantly, however, there was no claim by

---

4.      This situation is equally dissimilar to the decision in *State v. Phair*, 2004 SD 88, 684 NW2d 660, relied upon in Justice Zinter's dissent.  Phair was charged with theft by deception for her failure to "disclose a known lien, adverse claim or other legal impediment to the enjoyment of property. . . ."  *See id.* (quoting SDCL 22-30A-3(4)).  Defendant was charged with theft by deception in "[c]reat[ing] or reinforce[ing] a false impression, including false impressions as to law, value, intention, or other state of mind[.]"  *See* SDCL 22-30A-3(1).  Phair's decision not to disclose a known impediment to her lender is irrelevant to deciding whether there is sufficient evidence to convict a defendant for creating or reinforcing false impressions with the intent to defraud.  In *Phair*, the Court examined whether it was acceptable to exclude evidence of Phair's intent to repay the loan.  Properly, the Court concluded that evidence of an intent to repay the loan did not save a defendant from conviction for a failure to "disclose a known lien, adverse claim or other legal impediment to the enjoyment of property" under SDCL 22-30A-3(4), because regardless of the intent to repay, Phair made the improper disclosure *at the time* the loan was obtained.  Here, the parties' contract provided that the Hemmers would loan defendant money and defendant would repay under the terms of the agreement.  There is no evidence that defendant intended not to fulfill his obligation to repay.  This lack of evidence, unlike the evidence that the defendant in *Phair* intended to repay, is important in light of the fact that an intent to defraud "'means to act willfully and with the specific intent to deceive or cheat, ordinarily for the purpose of either causing some financial loss to another or bringing about some financial gain to one's self.'"  *See* *Morse*, 2008 SD 66, ¶12, 753 NW2d at 919 (citations omitted).  There is no evidence that defendant intended to cause a financial loss to the Hemmers or a gain to himself.  Regardless of his use of the loan proceeds for personal expense, defendant remained obligated to repay on the loan and there is no evidence that he did not intend on fulfilling this obligation.

the Hemmers that at the time defendant obtained any of the advances he had no intent on repaying them under the terms of the parties' loan contract. In fact, under the contract, from the dates of each draw, the Hemmers accrued 10% interest on defendant's loan obligation, which interest would continue to accrue until defendant repaid Hemmers.

[¶15.]       Theft by deception is a specific intent crime that requires proof that defendant obtained property with the intent to defraud. SDCL 22-30A-3. There must be evidence that defendant acted "willfully and with the specific intent to deceive or cheat[,]" to either cause some financial loss to another or bring about some financial gain to himself. *Morse*, 2008 SD 66, ¶12, 753 NW2d at 919 (citations omitted). The prosecution provided no evidence that at the time defendant obtained the draws or when he entered into the loan contract, he did so with the intent to defraud. There is no pattern of conduct on defendant's part of entering into a loan agreement and absconding with the money.[5] Rather, the evidence shows that defendant entered into an agreement similar to the one made earlier with the Hemmers that was successfully completed.

[¶16.]       Essentially, the State argues that because defendant failed to proceed with the construction of the house in a timely fashion and spent part of the loan proceeds on items not related to the construction of the house, defendant stole

---

5.    Both dissents contend that there is evidence of a common scheme by defendant to support finding defendant guilty of theft by deception in this case. These claims miss the mark because the previous situations in which defendant obtained money did not involve construction loan agreements. In those instances, defendant was paid money, with no expectation of repayment, based on his promise to complete certain work. *See infra* note 6.

money from the Hemmers by deception.[6]  A crucial element of theft by deception is missing, however.  There is no evidence, and nothing by which this Court can infer such evidence, that defendant entered into the loan agreement or obtained the loan proceeds "with the intent to defraud[.]"[7]  *See* SDCL 22-30A-3.

[¶17.]      We recognize that at times when defendant obtained money under the loan agreement, he lied to the Hemmers about the progress on the house, which may have "[c]reate[d] or reinforce[d] a false impression as to law, value, intention, or other state of mind."  *See* SDCL 22-30A-3(1).  Yet, creation of these false impressions about the progress on the house in no way supplanted the requisite proof of the "intent to defraud" element.  There is no evidence that at the time defendant obtained the draws from the Hemmers that he deceived them into

6.    The State called witnesses who testified about construction projects defendant failed to complete despite being paid.  Those instances did not involve loan agreements with defendant.  In those cases defendant was paid to complete certain construction work and it did not get completed as promised.  Here, defendant did not promise to complete construction of the Brookings home in a certain amount of time, or agree to construct the home per Hemmers' desires.  Therefore, while the loan was for the purpose of constructing a "spec house," the other construction-related experiences with defendant provided no proof that defendant did not intend on repaying the Hemmers under the terms of the loan agreement.

7.    Although Justice Zinter's dissent is correct that defendant falsely represented the status of the house in order to obtain additional advances under the terms of the parties' contract, these false representations alone do not establish that at the time he obtained the draws he intended to defraud the Hemmers under the terms of the parties' agreement.  No evidence was offered that defendant did not intend on repaying under the terms of the loan.  The dissent's evidence, on the other hand, supports the view that defendant failed to comply with the terms of the parties' contract, i.e., the expending of funds for labor and expenses.  Defendant's failure to comply with the contract terms, however, is a breach of contract, not theft by deception.

believing he would repay the loan, when in fact he had no such intent. Moreover, while the loan contract states that defendant is to "pay from such loan proceeds for all material and labor used in the construction of such house[,]" this clause is not exclusive.

[¶18.] A careful reading of the parties' Construction Loan and Escrow Agreement reveals no promise by defendant to apply all loan proceeds to the construction of the "spec house." Indeed, at the time defendant obtained the loan proceeds, he obtained additional debt, and had a consequent obligation to repay it. There is no evidence that at the time he received the loan proceeds he intended to deprive the Hemmers of their money. As the contract states, "all monies lent by Hemmers" to defendant under the contract were to be repaid in full plus 10% interest. Thus, regardless of defendant's progress on the house or where he spent the loan proceeds, defendant was indebted to the Hemmers for the full loan amount, plus 10% interest.[8] The statute under which defendant was charged does not criminalize defaulted loans.

[¶19.] There being no evidence to support proof that defendant entered into the loan agreement, or obtained loan proceeds, with the intent to defraud the Hemmers, there is insufficient evidence to sustain defendant's conviction. Because

---

8.  Contrary to Justice Zinter's claim that it can be inferred from defendant's failure to complete the project that he had the intent to defraud, such inference would be improper in this case. The parties' contract does not require completion by a certain date and there is no evidence that defendant obtained the advances from the Hemmers based on a promise to complete the house within a certain time.

the conviction cannot stand, we need not consider whether the State proved venue or established identification.

[¶20.]		Reversed.

[¶21.]		MEIERHENRY and SEVERSON, Justices, concur.

[¶22.]		GILBERTSON, Chief Justice and ZINTER, Justice, dissent.


GILBERTSON, Chief Justice (dissenting).

[¶23.]		I respectfully dissent for the reasons stated in *State v. Morse*, 2008 SD 66, ¶¶30-44, 753 NW2d 915, 923-27 (Gilbertson, C.J., dissenting), and *State v. Jackson*, 2009 SD 29, ¶¶29-34, 765 NW2d 541, 548-550 (Gilbertson, C.J., dissenting).

> This Court does not retry cases de novo. Instead, we review the evidence in the light most favorable to the jury's verdict. In a similar theft by deception case, we set forth our standard of review. . . . Where conflicting evidence is present, as in this case, and the credibility of witnesses is in issue, then it is a question of fact for the jury. The jury is physically present at the trial and, therefore, in the best position to judge the demeanor and credibility of the witnesses. This standard of review is vitally important in a theft by deception case, because rarely, if ever, will a defendant get on the stand and announce that he or she had the specific intent to defraud. *"The proof of fraudulent intent need not be direct; it may be inferred from expressly proven acts of the accused and surrounding circumstances."* People ex rel. BJT, 2005 SD 123, ¶10, 707 NW2d 489, 492 (quoting State v. Teutsch, 80 SD 462, 466, 126 NW2d 112, 115 (1964)).

*Morse,* 2008 SD 66, ¶31, 753 NW2d at 923-24 (citations omitted) (emphasis added).

[¶24.]		As in *Morse* and *Jackson,* the Court eschews the jury's ability to consider the demeanor and credibility of the witnesses and to draw conclusions about the defendant's specific state of mind and intent from the evidence. The

Court supplants the jury's conclusions with its own by re-weighing the evidence and improperly disregarding evidence put before the jury.

[¶25.] The jury could have reasonably inferred from the evidence that Kessler did not intend to ever complete the project, but instead sought to take draws from the Hemmers for his personal financial gain. While the Court relies heavily on Kessler's self-serving statements that he always intended to complete the second home, the jury is the proper judge of his credibility. The jury was free to disregard his stated intent and instead infer that he had planned to dupe the Hemmers from the beginning. The Court appears to reason that simply because Kessler had performed *some* of the construction, or because he completed the first home, he *must* not have intended to defraud the Hemmers when he agreed to build the second home. However, this is not a *necessary* conclusion; Kessler could have performed some of the work on the second home, *and* intended to defraud the Hemmers. The jury found that he did so intend.

[¶26.] The jury heard evidence that Kessler had a number of previous construction projects where he had failed to complete the project, and from which he had received significant amounts of money for his personal financial interests. These other projects established a common scheme for Kessler to enter into construction projects, receive money over a period of time, claim delays and the need for additional money, spend the money on personal debts and expenses, only partially complete the work, then walk away from the unfinished project leaving the other party in the lurch.

[¶27.]    For example, in 2001, Kessler entered into a home construction project in Omaha, Nebraska. After Kessler received money to pay for the construction materials and labor, numerous liens were placed against the home by lumberyards and subcontractors. Rather than using the advanced money to pay for the construction, Kessler had used some of the money for his own purposes. The outstanding liens totaled approximately $104,000. Eventually, Kessler signed a $41,000 promissory note to the homeowner for repayment of monies advanced to him. Kessler had only paid $1,100 against this promissory note, signed in 2002, by the time of the instant trial, October 2008.

[¶28.]    The Court's statement that "There is no pattern of conduct on defendant's part of entering into a loan agreement and absconding with the money" is misleading. *See supra* ¶15. While it is true that the Omaha project did not technically involve a "loan," it was a similar enough "agreement" to warrant a jury's conclusion that this was Kessler's scheme for deceiving the Hemmers.

[¶29.]    The Court attempts to distinguish the legal consequence of Kessler's contractual "duty to repay" the loan to the Hemmers from the contractual "duty to perform services" present in *Morse* and *Jackson*. *See supra* ¶¶12-14, ¶16 n3. This should be a distinction without a difference; under SDCL 22-30A-3(1) we are concerned with the promissor's specific intent to obtain property of another by deception, regardless of whether that deception is accomplished by a false promise to repay *or* a false promise to perform. The Court appears to suggest that if one borrows money with no specific repayment date, the "obligation to repay" that loan precludes any criminal liability, irrespective of the borrower's intent never to repay.

*See supra* ¶14. This is an invalid basis for disregarding the State's evidence. *See supra* ¶16, n3. Furthermore, Kessler has not appealed from the circuit court's admission of this evidence; the Court makes this argument *sua sponte*. The Court's disregard of this evidence simply reflects its effort to override the jury's decision and retry the evidence.

[¶30.]    In the instant transaction, the Construction Loan and Escrow Agreement for the second home was signed on August 15, 2007. This agreement provided up to $199,900 to Kessler from the Hemmers. Kessler received approximately $141,000 under this agreement by early October 2007. The bank account where Kessler had deposited the money was overdrawn by October 7, 2007. Because he had not used this money to build the second home, he was unable to complete the project. In fact, Kessler asked for an additional $35,000 from the Hemmers the day before they discovered that the house was nowhere near complete. The Hemmers, quite reasonably, refused to "loan" another $35,000 to Kessler. The evidence showed that Kessler never provided an accounting of his spending to the Hemmers until *after* they had visited the construction site and refused to loan him any more money. By his own accounting, of the $198,681.66 Kessler had borrowed, only $72,746 went toward construction expenses. The remaining $126,000 went toward his personal expenses. Kessler admitted that he had no other source of income; he had no means of either repaying the loan or finishing the home.

[¶31.]    Given this evidence, and the evidence of Kessler's previous schemes, the jury could have reasonably inferred that, at the time Kessler entered into the

agreement in August 2007, he did not intend to repay the loan but to deposit it into a bank account and spend it all within two months. He then continued the façade, seeking to get more money from the Hemmers, until they actually visited the worksite and discovered his deception. These inferences are neither unreasonable, nor are they "inferred from the fact *alone* that [Kessler] did not subsequently perform the promise." *See* SDCL 22-30A-3(1) (emphasis added).

[¶32.]     The Court correctly states that "The statute under which defendant was charged does not criminalize defaulted loans." *See supra* ¶18. However, while this statement is true, it misses the more salient point; the statute *does* criminalize entering into a loan with the specific intent to default on it. That is what Kessler was convicted of by the jury. The jury's verdict should be upheld as required by our standard of review. The circuit court did not err in denying Kessler's motion for a judgment of acquittal.

[¶33.]     I dissent.

[¶34.]     I also join the dissent of Justice Zinter.


ZINTER, Justice (dissenting).

[¶35.]     The majority reverses, finding no evidence of deception with intent to defraud because this case involved a loan and there was no evidence "at the time [Kessler] obtained the draws or when he entered into the loan" that he "had no intent [to repay Hemmers] under the terms of the parties' loan contract." *See supra* ¶¶14-15, 17. The majority errs in: (1) misapplying our standard of review; (2) failing to consider Kessler's history of similar schemes and the misrepresentations

he made to obtain loan advances that he could not have received without deceiving Hemmers; and, (3) misapplying the law regarding intent to defraud in loan transactions. Kessler concededly made misrepresentations to obtain four advances that were restricted by the agreement to be used "for the purpose of purchasing such lot and constructing such house."[9] When the misrepresentations are considered with Kessler's history under the correct legal standards, a rational jury could have found that he obtained $105,000 from the Hemmers by deception. Because "[a]mounts involved in thefts, whether from the same person or several persons, committed pursuant to one scheme or course of conduct, may be aggregated in determining the degree of the offense," SDCL 22-30A-18, and because "[t]heft is aggravated grand theft, if the value of the property stolen exceeds one hundred thousand dollars," SDCL 22-30A-17.1, I would affirm the circuit court.

[¶36.] The majority correctly observes "that there must be evidence of a purpose to deceive or an intent to defraud *at the time* the property or money is *obtained*." *Supra* ¶11 (emphasis added) (citing State v. Morse, 2008 SD 66, ¶12, 753 NW2d 915, 919; State v. Jackson, 2009 SD 29, ¶18, 765 NW2d 541). In this case, Kessler obtained money in the form of checks (loan advances) from the Hemmers on four occasions when there is no dispute he made misrepresentations. The first of

___

9. The Construction Loan and Escrow Agreement, which governed the advances, further provided that Kessler was to pay from the advances "all materials and labor used in the construction of such house." Kessler also deceived the Hemmers with respect to this condition. In obtaining the advances, he did not disclose that he was using substantial loan proceeds for purposes unrelated to the purchase of materials and labor for the house.

those occasions was on September 14, 2007, and the last on November 27, 2007. The aggregate amount obtained was $105,000.

[¶37.]     Because that money was advanced for construction of the house, on each of these occasions Sharon Hemmer inquired about the status of the house. Kessler falsely responded that "the house was doing well."  In his last unsuccessful attempt to obtain an advance, Kessler falsely represented that construction had proceeded to the point that he was "inside the house finishing up."  *Supra* ¶5. There is, however, no dispute that only limited framing had been completed, the house had no windows, no roof, and it appeared to only be at the beginning stage of construction.  *Supra* ¶6.  Thus, the majority properly concedes that Kessler "lied to the Hemmers about the progress on the house, which may have '[c]reated or reinforce[d] a false impression as to the law, value, intention, or other state of mind.'" *Supra* ¶17.

[¶38.]     Further, there is no dispute that Kessler had no money to finish the project or repay the loan, and that he used the advances for personal purposes unrelated to the house.  Moreover, there was evidence of a common scheme (involving three other projects) in which Kessler would obtain money for other construction projects, but divert the money for personal use and fail to complete the project.  *See supra* ¶¶26-28 (Gilbertson, C.J., dissenting).  *See also* Iowa v. Rivers, 588 NW2d 408 (Iowa 1998) (concluding there was sufficient evidence in light of prior history of obtaining payments without completing the project); Baker v. State, 588 So2d 945 (Ala Crim App 1991) (same).

[¶39.] Considering Kessler's financial condition, his common scheme, and the nature of his misrepresentations, a jury could have concluded that Kessler's lies were intended to obtain money by deception on those four occasions. This evidence was sufficient to support the jury's finding that Kessler "obtained property of another by deception," and that he did so with intent to defraud by "creat[ing] or reinforc[ing] a false impression" regarding *existing facts,* aside from his intent to repay the loan in the future. The existing facts included the status of the project and his use of the advances, either one of which was sufficient to constitute aggravated grand theft under SDCL 22-30A-3(1), 22-30A-17.1, and 22-30A-18. *See infra* ¶41.

[¶40.] The majority attempts to create a distinction between an agreement to perform services and a loan agreement to repay money. *See supra* ¶¶12-14. The majority rationalizes that no criminal offense occurred because the money taken from Hemmers was due "regardless of defendant's completion of the construction," that the loan "was secured to a certain extent," *supra* ¶13, and that Hemmers were entitled to interest at 10% from the date of each draw, *supra* ¶14. Thus, the majority proclaims there was "no evidence, and nothing by which this Court can infer such evidence, that defendant entered into the loan agreement or obtained the loan proceeds 'with the intent to defraud.'" *Supra* ¶16. In the majority's view, there must be evidence that Kessler never intended to repay the loan; and, neither Kessler's history of prior similar schemes nor his contemporaneous misrepresentations made to obtain advances on the loan are relevant under SDCL 22-30A-3(1) because Kessler was still required to repay a partially secured loan and

Hemmers were entitled to interest.  The majority states that SDCL 22-30A-3(1) "does not criminalize defaulted loans."  *Supra* ¶18.  This analysis is incorrect for two reasons.

[¶41.]  First, the majority's rationale for not considering Kessler's "lies," *supra* ¶17, is at odds with our settled law on intent to defraud in loan transactions.  Despite the lies Kessler used to obtain the advances, the majority finds no evidence of intent to defraud because "[t]here is no evidence that at the time defendant obtained the draws from the Hemmers that he deceived them into believing he would repay the loan, when in fact he had no such intent."  *Id.*  This Court, however, when interpreting SDCL 22-30A-3 (including its broader historical origin in the common law of larceny by false pretenses), adopted the law that "intent to repay the loan" is irrelevant when misrepresentations are used to obtain loan advances.  State v. Phair, 2004 SD 88, ¶7, 684 NW2d 660, 662-63 (holding evidence of repayment was irrelevant in case involving title misrepresentations to obtain loans).  This Court explained that "[t]he gravamen of the offense is obtaining the property of another by purposely creating a false impression."  *Id.*  In specifically rejecting the argument that evidence of "intent to not repay the loan" was required, we adopted the law "that a loan transaction may result in [the commission of this offense] where loan funds are obtained by a false pretense irrespective of the defendant's intent to repay or actual repayment of the loan."  *Id.*, ¶9 (citing Com. v. Lewis, 48 MassAppCt 343, 720 NE2d 818, 822 n3 (1999) (emphasis added).  The language we adopted by our reference to *Lewis* applied to the broad common-law

offense of larceny by "false pretenses," which underlies all aspects of SDCL 22-30A-3 and unequivocally provides:

> Although couched in the form of a loan, the transaction could still result in a *larceny by false pretense* even if the defendant intended to repay the loan and even if the loan had been repaid; the gravamen of the charge is obtaining the funds by a false pretense and not whether there was present intent to repay or actual repayment.

*Lewis*, 48 MassAppCt at 346 n3, 720 NE2d at 822 n 3 (emphasis added). In evaluating the nature of the evidence necessary to prove specific intent to deceive or cheat by causing financial loss to another in loan cases, we adopted the rule that the lender must merely be deprived of accurate information necessary to assess the risk of loss it faces:

> [S]ufficient intent to inflict harm can be found from the intentional withholding of information from a lender which lowers the value of the transaction due to the lender's lack of information pertinent to the accurate assessment of the risk it faces and the propriety of extending credit to that particular individual, and because of the increased expense and difficulty of any necessary bill collection efforts. Because this intent is sufficient, it is irrelevant whether the borrower intended in good faith to repay the loan.

*Phair,* 2004 SD 88, ¶10, 684 NW2d at 664 (quoting US v. Karro, 257 F3d 112, 118 (2dCir 2001)). Today's majority errs in failing to follow our precedent that does not require proof of "intent to not repay the loan" at the time the loan was made or the advances were obtained.[10]

---

10. The majority contends that *Phair* is distinguishable because it involved a different subdivision of theft by deception. *See supra* note 3, pointing out that subdivision (4) involves failure to disclose a lien, adverse claim, or other impediment to the property given as collateral, and subdivision (1) involves the creation or reinforcement of false impressions regarding law, value,

(continued . . .)

[¶42.] Second, the majority fails to follow our standard of review of the evidence. With respect to the evidence regarding Kessler's intent in obtaining the advances, the majority attempts to justify its result by offering potential reasons why the evidence of Kessler's prior similar schemes, his contemporaneous "lie[s]. . . about the progress on the house," *supra* ¶17, and his inability to repay the advances should not be considered evidence of intent to deceive or defraud. S*ee supra* notes 3, 4, and 5, and ¶¶17-18. "However, in reviewing rulings on acquittal motions, [including a case in which false statements were made to obtain loan advances], this Court does not look to the evidence favorable to the appellant." *Phair*, 2004 SD 88, ¶16, 684 NW2d at 665. Therefore, the majority's possible rationalizations improperly reweigh the evidence and fail to give the verdict the deferential inference to which it is entitled. *See* State v. Frazier, 2001 SD 19, ¶44, 622 NW2d 246, 261. As we have often stated: "In measuring evidentiary sufficiency, we [only] ask 'whether, after viewing the evidence in the light most favorable to the

_____

(. . . continued)

intention, or other state of mind. The majority is mistaken because the issue is one of intent to defraud and the "intent to defraud" element is found in identical language contained in the preamble to both subdivisions. Furthermore, in the context of this case, there is no material distinction between "intent to defraud" through deception causing financial loss to another by *failing to disclose* a lien or *other impediment* regarding the home under subdivision (4) and *creating a false impression* regarding the home under subdivision (1). The essence of Kessler's deception fits either subdivision. Regardless of intent to repay the loan, he made misrepresentations concerning the value of the home at the time he obtained advances. He could not have obtained the loan advances without deceiving Hemmers with regard to the status of their collateral. This is significant because, as previously noted, the entire "theft by deception [statute] is a codification of the common law offense of theft by false pretenses." *Phair,* 2004 SD 88, ¶7, 684 NW2d at 662.

prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *State v. Disanto*, 2004 SD 112, ¶14, 688 NW2d 201, 206 (quoting *Jackson v. Virginia*, 443 US 307, 319, 99 SCt 2781, 2789, 61 LEd2d 560 (1979)).

[¶43.]     Surely, if the evidence is viewed without reweighing Kessler's history of similar conduct, his financial condition at the time of the advances, his lies to obtain the advances, and his failure to finish the project and repay the advances,[11] the evidence was sufficient to inferentially suggest he had the specific intent to "deceive or cheat" at the time he made the misrepresentations to obtain those four advances. *See supra* ¶11. Here, the jury was clearly justified in finding that through his misrepresentations, Kessler obtained $105,000 that the Hemmers would not have otherwise advanced. Through his lies, Kessler withheld information from Hemmers regarding the value of the transaction and deprived them of information pertinent to the accurate assessment of the risk they faced in making the advances. Kessler's lies also increased the expense and difficulty of collection. Ultimately, the majority's failure to follow South Dakota law on the nature of the evidence necessary to provide proof of intent to defraud in loan transactions, and the majority's failure to give the jury verdict the deference to which it is entitled, provide an unprecedented form of criminal insulation to those who utilize

---

11.    The majority fails to recognize that the statute *allows* some inference of intent to deceive when the actor does "not subsequently perform." *See* SDCL 22-30A-3(1) (providing that deception may not be inferred solely from an actor's failure to perform a promise).

misrepresentations to obtain loan advances.  The proscription in SDCL 22-30A-3(1) is not so limited.  The bench, bar and Legislature will be surprised to learn that, following the majority's analysis, so long as a loan agreement is made with innocent intent, subsequent deceit regarding existing facts (the status and value of the collateral) employed to obtain unauthorized loan advances is not subject to the theft by deception statute.  I cannot join that erroneous premise.

[¶44.]      Because Kessler concededly lied to obtain at least $105,000 in loan advances that he, quite obviously, could not have otherwise obtained without deception, I respectfully dissent.